## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JOHN DOE NO. 1,

              Plaintiff,

v.

KNIGHTS OF COLUMBUS,

           Defendant.

3:10 - CV- 1960 (CSH)

## RULING ON DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND DEFENDANT'S MOTION TO BIFURCATE

**HAIGHT, Senior District Judge:**

### I.  INTRODUCTION

Plaintiff John Doe No. 1 (herein "Plaintiff") brings this action for damages arising from horrific sexual abuse he allegedly endured over a six-year period when he was a minor engaged in the activities of the Columbian Squires ("Squires"), the national youth program of defendant Knights of Columbus ("Defendant" or "KOC").  Specifically, Plaintiff alleges that he was sexually molested by Julian Rivera ("Rivera"), the adult leader assigned by KOC to supervise the Brownsville, Texas unit of the Squires, in which Plaintiff participated from 1978 to 1986.

Plaintiff's Complaint sets forth two counts: (1) negligence for KOC's alleged failure to ensure Plaintiff's safety and well being while he  was in the custody and care of the Squires, particularly, *inter alia*,  by failing in its duties of "placement, retention and supervision of Rivera as an adult leader," Doc. #1 (Complaint), ¶¶ 25-33;  and (2)  declaratory relief –  a request for declaratory judgment that Plaintiff relied on the intentional, fraudulent misrepresentations of a KOC

agent to execute the signature page later attached to the document entitled "Settlement Agreement and Full Release" ("Release"), rendering the Release void in that KOC procured it "by fraud," *id*., ¶¶ 34- 42.

Pending before the Court is Defendant's motion to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. #17.   Defendant sets forth three bases for dismissal: (1) Plaintiff's claim for negligence is barred by the Texas two-year statute of limitations; (2) Plaintiff fails to plead the required element of "foreseeability" to maintain a negligence action; and (3) Plaintiff fails to state a claim for fraud and misrepresentation with respect to Defendant's procurement of the Release in that (a) Plaintiff was not justified in relying on the alleged misrepresentations of KOC's agent when Plaintiff signed the Release, and (b) Plaintiff ratified the Release as a matter of law.

Also pending before the Court is Defendant's alternative motion to bifurcate pursuant to Federal Rule of Civil Procedure 42(b).  Doc. #22.  In that motion, Defendant requests "a separate trial" on each of the two counts set forth in Plaintiff's Complaint.  *Id*., p. 1.   KOC asserts that a preliminary trial of Plaintiff's declaratory relief claim, involving KOC's alleged fraud and misrepresentation in procuring the Release, should precede trial on his negligence claim.  In support, KOC seeks a preliminary determination as to the validity of the Release because that determination:  (1) would be  "potentially dispositive," (2) may "save the Court and the parties valuable resources and time," and (3) would prevent KOC from suffering "unnecessary and undue prejudice" which would likely occur if the same jury determining the validity of the Release heard the "potentially graphic" evidence of sexual abuse Plaintiff will present with respect to his negligence claim.  Doc. #23, p. 1-2.

The Court will first address Defendant's Motion to Dismiss to determine which, if any, of Plaintiff's actions states a valid claim upon which relief may be granted. Upon making this ruling, the Court will turn to Defendant's Motion to Bifurcate.

## II.    FACTS

### A.    The Parties

Plaintiff John Doe is an adult male resident of the State of Kansas who was born in 1968.[1] He filed the case at bar under the pseudonym "John Doe 1" in order "to protect his identity as victim of childhood sexual abuse and prevent further psychological harm . . . if his name were publicly disclosed." Doc. #1, ¶ 1.

Defendant KOC is a "Catholic fraternal benefit organization that was created as a social network intended to provide financial assistance to its members and engage in religious and charitable works." *Id.*, ¶ 7. The president of KOC is known as the "Supreme Knight" and the organization is governed by a board of directors, known as the "Supreme Council." *Id.* Membership in KOC is open to men 18 years of age or older who are practicing Catholics committed to supporting the Catholic Church and improving their respective communities through "pro-life and youth activities." *Id.*, ¶ 8. Since its inception in 1882 in New Haven, Connecticut, KOC has increased in size from several members, comprising one council, to more than 1.8 million members, constituting more than 14,000 councils throughout the United States and various other countries in the world. Doc. #18, p. 9-10. Each KOC council is directly subordinate, "under the direction and control," of the KOC headquarters in New Haven, Connecticut. Doc. #1, ¶ 9.

---

[1]  Plaintiff's complaint states that he is "sui juris." According to Black's Law Dictionary (9th ed. 2009), "sui juris" is defined as "[o]f full age and capacity."

3

The Columbian Squires program, founded in 1925, is the official national youth program of KOC. *Id.,* ¶ 10. The Columbian Squires recruit Catholic boys "between the ages of 10 and 18 who are committed to developing their leadership qualities and supporting the Roman Catholic Church." *Id.* Each Columbian Squires unit must operate within the structure and regulations of KOC. *Id.* Moreover, "[a]ccording to the [KOC] regulations, each Columbian Squires unit is overseen and supervised by at least one adult [KOC] member." *Id.*

### B.   <u>Allegations of Sexual Abuse</u>

In 1978, when Plaintiff was approximately ten years old, he was introduced to the Columbian Squires in Brownsville, Texas. *Id.,* ¶11. Plaintiff alleges that between 1978 and 1986 he was subjected to "horrific child sexual abuse" by Juan "Julian" Rivera, who was appointed by KOC as adult leader of the Columbian Squires program in Brownsville, Texas. *Id.,* ¶ 6. Plaintiff asserts that Rivera "actively solicited" him to join the Columbian Squires, "telling [Plaintiff] and his family that as a Squire, [Plaintiff] could do much to help people" and that "his involvement in the Squires would positively affect [Plaintiff's] growth and development as a person." *Id.*, ¶ 11. According to Plaintiff, during his time as a Squire, Plaintiff was "groomed and sexually abused [by Rivera] at various locations throughout the United States," "including many local and national events for the Columbian Squires." *Id.*, ¶¶ 6, 17.

In particular, during Plaintiff's first two years in the Squires, on at least ten occasions, Rivera allegedly provided Plaintiff with increasingly sexually graphic pornography to view with Rivera, including "graphic sexual depictions" of "homosexual activity." *Id.*, ¶ 13. When Plaintiff was approximately twelve years old, Rivera allegedly took Plaintiff on an overnight trip and gave him

4

"large amount[s] of whiskey and marijuana until [Plaintiff] became intoxicated and passed out."[2] *Id.*, ¶ 14. "When [Plaintiff] awoke, Rivera was naked from the waist down, pulling his pants up from around his ankles." *Id.* On another evening during the same trip, Rivera allegedly gave Plaintiff a white pill and alcohol to help him "relax." *Id.*, ¶ 15. Then, according to Plaintiff, Rivera insisted that Plaintiff give him a massage. *Id.* When Plaintiff refused, Rivera allegedly "pulled a small handgun out of his pocket and placed it next to him on the ground and told [Plaintiff] there was nothing wrong with a massage." *Id.* Plaintiff asserts that his fear of being shot by Rivera compelled him to perform the requested massage and other sexual demands by Rivera. *Id.* Following the sexual massage incident, Rivera allegedly told Plaintiff that "he could never tell anyone what happened or Rivera would kill [Plaintiff's] family." *Id.*

Plaintiff maintains that over the next six years, Rivera continued "brutally and horrifically sexually abus[ing]" him. *Id.*, ¶ 16. Plaintiff alleges that Rivera also continued issuing threats of bodily harm and death to Plaintiff and/or his family if Plaintiff spoke of Rivera's actions or refused to comply with his sexual demands.[3] *Id.*

_____

[2] Plaintiff cites numerous instances of Rivera plying him and/or other Squires with alcohol or narcotics prior to sexual abuse. *See, e.g.,* Doc. #1, ¶ 11 (Plaintiff "quickly learned that . . . [Rivera] frequently gave [the other boys] alcohol and encouraged them to drink around him"); ¶ 17 (during trips to local and national Squires events, "Rivera would give [Plaintiff] and the other boys alcohol"); ¶ 19 (Rivera introduced Plaintiff to another KOC adult leader at a KOC event, who later "plied [Plaintiff] with alcohol and drugs" and "sexually abused him.").

[3] Plaintiff described such threats as follows:

[Rivera] often told [Plaintiff] that if he told anyone what was happening, Rivera would kill [Plaintiff's] family, or cut off [Plaintiff's] penis and send it to [Plaintiff's] mother in a jar. [Plaintiff] frequently saw Rivera carrying a firearm and believed Rivera's threats. On at least one occasion, Rivera held a gun to [Plaintiff's] head and threatened to kill him if [he] did not comply with Rivera's demands for sex.

5

Furthermore, according to Plaintiff, "[d]uring the years he was sexually abusing [Plaintiff], Rivera also bought him clothing, gave him money, took him out to dinners, and allowed him to drive Rivera's [motor] vehicle." *Id.*, ¶ 18.  In addition to such gifts, Rivera allegedly encouraged Plaintiff to date girls from school to prevent others from becoming suspicious about his own sexual activity with Plaintiff.  *Id.*

With respect to locations of abuse, Plaintiff alleges that Rivera sexually abused him "in the local Knights of Columbus hall where the Columbian Squires met, as well as Rivera's office and apartment."  *Id.*, ¶ 17.  Plaintiff also  recounts that  "[t]he horrible, nightmarish sexual abuse occurred at multiple locations in the United States on overnight trips, including many local and national events for the Columbian Squires."  *Id.*  During such trips, not only did Rivera allegedly give Plaintiff and other minor boys alcohol, he repeatedly took the intoxicated Plaintiff to a "hotel room to engage him in sexual contact."  *Id.*   Rivera also allegedly "shared" Plaintiff "with at least one  other  adult  leader  of  the  Columbian  Squires  in  another  city."[4]  *Id.*, ¶ 19.   This  leader subsequently invited Plaintiff to visit him and attend church with him.  *Id.*  When Plaintiff thereafter visited this adult leader, the leader allegedly  "plied [him] with alcohol and drugs" and "sexually abused him."  *Id.*

Having alleged frequent and pervasive activities of sexual abuse by Rivera and at least one other Columbian Squires leader, including activities within the Brownsville Squires unit and in the KOC  hall, Plaintiff contends that KOC  "was aware that adult leaders used the Columbian Squires

---

Doc. #1, ¶ 16.

[4]   Plaintiff  also  alleges  that  "[o]n  another  occasion,  Rivera  brought  [Plaintiff]  to  visit Rivera's brother, who showed Rivera pornography and sexually abused [him]."  Doc. #1, ¶ 19.

6

to gain access to boys for purposes of pedophilia." *Id.*, ¶ 21.   Plaintiff further alleges that KOC "became familiar with the specific characteristics, patterns of behavior and 'red flags' that suggested an adult leader had sexual interest in boys."[5] *Id.*

Plaintiff ultimately left the Squires in Brownsville, Texas  in approximately 1986 when he turned 18 years old.[6] *Id.*, ¶ 6.   Due to his years of abuse by Rivera, Plaintiff has allegedly suffered "severe and permanent physical and psychological injuries, including, but not limited to, chemical addictions, nightmares, depression, anxiety, suicidal tendencies, lack of trust, anger, shame, embarrassment, guilt, and low self-esteem." *Id.*, ¶ 22.

C.   **Plaintiff's Signature on KOC Document in December 2009**

In 2009, when plaintiff was forty-one years old, he informed KOC officials that he had been sexually abused by Rivera during Plaintiff's years as a Squire. *Id.*, ¶ 23.   Plaintiff was "contacted by chief legal counsel of the [KOC], the Supreme Advocate."[7] *Id.*   Plaintiff disclosed to the Supreme Advocate that he had a "long history of chemical addiction as a result of Rivera plying him with drugs and alcohol, and that he wanted to enter a treatment program." *Id.*   The Supreme Advocate agreed that KOC would pay for Plaintiff's rehabilitation treatment. *Id.*   Plaintiff contends

---

[5]   Reading the Complaint broadly, in addition to abuse at KOC activities, such "red flags" might include, *inter alia*, the unusual gifts and privileges Rivera provided to Plaintiff during the period of abuse (*e.g.*, gifts of clothing, money, and dinners and use of Rivera's motor vehicle).  Doc. #1, ¶ 18.

[6]   Plaintiff contends  that  during the period when Rivera abused him, Rivera commented frequently about engaging other boys in sexual conduct and clarified that he "would 'trade [Plaintiff] in' when he turned 18 because he would be too old and Rivera would not want him anymore." Doc. #1, ¶ 20.

[7]   During  his  contact  with  the  KOC Supreme Advocate in December of 2009, Plaintiff "was informed that Rivera [was] still active as a leader of the Columbian Squires." Doc. #1,  ¶ 23.

7

that at no time during his discussions with the Supreme Advocate was there any mention of payment to settle Plaintiff's legal claims against KOC. *Id.*

On December 23, 2009, a KOC agent and his wife met with Plaintiff.[8] *Id.*, ¶ 24. They informed him that they would give Plaintiff "$200 to pay his travel expenses to the rehabilitation facility." *Id.* Before turning the money over to Plaintiff, however, the agent allegedly requested that Plaintiff "sign a document acknowledging receipt of the $200, and [Plaintiff] complied." *Id.* According to Plaintiff, the agent then gave him another separate, "single piece of paper" and "asked him to sign it to acknowledge that the [KOC] would pay for his treatment." *Id.* "No other pages were attached to the paper [that] the agent asked [Plaintiff] to sign." *Id.* Plaintiff then "signed the paper as instructed, and the [KOC] agent's wife notarized the document." *Id.* The KOC agent then gave Plaintiff "$200 in cash and quicky left."[9] *Id.*

Approximately one week later, Plaintiff "received a package in the mail with a copy of the document []he signed acknowledging receipt of the $200, along with an eight page document he had

---

[8]   The Complaint does not specify where the documents at issue were executed. Doc. #1, ¶ 24. "John A. Mahon," whose name appears on the Notary Public stamp and on the Notary Public signature line as the person who witnessed Plaintiff's signature on the alleged release, was commissioned by the "State of Kansas" according to his stamp. Doc. #1, p. 17. However, it is also possible that the signing took place in Missouri because the signature page mentions that the Plaintiff was "presently residing in Missouri" and identified by the Notary Public through an identification card "issued by the state of Missouri." *Id.*, p. 17.

[9]   The Court notes, as stated *supra* herein in n. 8, that the notary's name on the attached "Settlement Agreement and Full Release" (Doc. #1, Ex. A) is "John A. Mahon" and Plaintiff contends that the document he actually signed was notarized by the KOC agent's wife. Doc. #1, ¶ 24. There thus appears to be a factual discrepancy as to who notarized the "single piece of paper" Plaintiff signed on December 23, 2009. *Id.*

never seen before entitled 'Settlement Agreement and Full Release.'"[10] *Id.*  The second signature

page Plaintiff signed on December 23, 2009 was attached to the purported "Settlement Agreement

and Full Release."  *Id.*  Plaintiff maintains that he was "never presented with the release at the time

he signed the [one-page] document [on December 23, 2009], nor was he otherwise informed that by

his signature he would be releasing valuable legal rights" against KOC.  *Id.*

### D.     Plaintiff's Complaint

Plaintiff filed the present action on December 14, 2010, in this Court.  In his Complaint, he

has set forth two claims against the KOC.  Plaintiff's first count is a negligence action, alleging that

KOC failed "to use reasonable care to ensure the safety, care, well being and health of the minor

---

[10]    Plaintiff attached  the document entitled,  "Settlement Agreement and Full Release" to
his Complaint as Exhibit A. Doc. #1, Ex. A; *see also id.*, ¶ 24.   That purported agreement states,
in the section captioned, "Full Release of Liability":

> In consideration of the Settlement Amount set forth in Paragraph 1 of this Agreement
> [*i.e.*, $11,000 paid by the KOC to Crossroads Centre in St. John's, Antigua, West
> Indies, for the treatment of plaintiff's chemical  dependency from December 26,
> 2009, till January 24, 2010, the expense of round-trip airfare to travel to and from
> Antigua, and reasonable additional itemized sums not to exceed $100,000 and yet to
> be determined], the **Releasor** [Plaintiff] **expressly waives** any and all rights, benefits,
> and defenses he may have or which may be derived from the provisions of applicable
> law including, without limitation, **any and all known and unknown claims and
> resulting damages and losses,** and the consequences thereof, sustained by the
> Releasor which have resulted or may result **from the Releasor's involvement with
> the Knights of Columbus, the Dioceses of Brownsville and Laredo, Texas,
> including,** but not limited to, **those in connection with any dealings between or
> among the Knights of Columbus Texas State Council and any of its subsidiaries,
> Knights of Columbus Squires and Julian J. ("Julian") Rivera**.

Doc. #1, p. 12, ¶ 2 ("Full Release of Liability") (emphasis added); *see also id.*, ¶ 1 ("Settlement
Amount").   On its face, this self-styled "agreement" and "release" explicitly  lists the office of the
"Knights of Columbus Headquarters, 1 Columbus Plaza, New Haven, CT 06510" as the address of
the Supreme Advocate of the KOC, who is the KOC "contact" to be notified by Plaintiff in the event
that there is an impending breach of "confidentiality" under the agreement. *Id.*, p. 14-15, ¶ 5.

[Plaintiff] when he was under the care, custody or in the presence of the [KOC]." Doc. #1, ¶ 26. In conjunction with this duty of reasonable care, KOC allegedly failed in its duties of "placement, retention and supervision of Rivera as an adult leader" of the Squires. *Id.* In particular, KOC allegedly failed to protect Plaintiff from "sexual assault and lewd and lascivious acts committed by Rivera." *Id.*, ¶ 27. Furthermore, "[a]t all relevant times, the [KOC] knew or in the exercise of reasonable care should have known that Rivera [possessed] the characteristics and behaviors of a person who would use the Columbian Squires as a means to gain access to boys for pedophilia, and that he was unfit, dangerous, and a threat to the health, safety and welfare of the minors entrusted to his counsel, care and protection." *Id.*, ¶ 28.

In his second count, Plaintiff seeks "declaratory relief" – *i.e*, a declaratory judgment that the release document attached to his Complaint as Exhibit A, entitled "Settlement Agreement and Full Release," is void as "procured by fraud." *Id*., ¶ 42. Plaintiff contends that there is an "actual controversy between the parties as to validity" of the agreement "concern[ing] the circumstances surrounding the execution of the signature page appended to the release document by Defendant [KOC]." *Id.*, ¶ 35. Plaintiff asserts that his signature was procured "by means of misrepresentation and deceit" in that the KOC agent misrepresented that "the document he was being asked to sign pertained only to their agreement regarding treatment, which was false and made as a statement of fact." *Id.*, ¶¶ 36-37. Furthermore, the KOC agent knew this statement to be "untrue" and made it to induce and deceive Plaintiff into relying on the misrepresentation to sign the document. *Id.*, ¶¶ 38-40. In sum, Plaintiff maintains that the so-called Release is "voidable as procured by fraud." *Id.*, ¶41. Where there is an "active controversy" regarding whether the Release is voidable and that "controversy affect[s] the legal claims" set forth in Plaintiff's Complaint, he seeks declaratory

10

judgment that "the release document . . .  is void  as procured by fraud."  *Id.*, ¶ 42.

## III.    JURISDICTION

Plaintiff asserts that this Court has federal diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), in that the matter in controversy exceeds $75,000, exclusive of interest and costs, and the action "is between citizens of different states."  Doc. #1, ¶ 4.   In an effort  to set forth his State of citizenship, Plaintiff declares in his Complaint that he is a "resident of the State of Kansas."  *Id.*, ¶ 1.  An individual's citizenship for diversity purposes, however,  is determined by his "domicile*,"* as opposed to residence.   *Palazzo v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000).[11]  "In general, the domicile of an individual is his true, fixed and permanent home and place of habitation" – *i.e,* "the place to which, whenever he is absent, he has the intention of returning."  *Martinez v. Bynum*,  461 U.S. 321, 331 (1983).   *See also Palazzo*, 232 F.3d at 42;  13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3612, at 526 (2d ed. 1984).  Although an individual may have several residences, he or she can have only one domicile.[12]  *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989)  (for jurisdictional purposes, "'[d]omicile' is not necessarily synonymous with 'residence,'" and "one can reside in one place but be domiciled in

---

[11]   *See also  John Birch Soc. v. Nat'l Broadcasting Co.*, 377 F.2d 194, 199 (2d Cir. 1967) ("it has long been held that a statement of residence, unlike domicile, tells the court only where the parties are living and not of which state they are citizens").

[12]   The  United  States  Supreme  Court  has  described  "residency"  as  occurring  "when a person takes up his abode in a given place, without any present intention to remove therefrom." *Martinez v. Bynum*,  461 U.S. 321, 331 (1983).   "[S]uch place of abode becomes his residence . . . ."  *Id.*   The test for residency is less stringent than the "more rigorous domicile test."  *Id*. "Residency" may be taken up for personal or business reasons and may be permanent for only a period of time.  *Id.*

11

another") (citations omitted).

Although Plaintiff has inartfully pled his citizenship, stating his residence as opposed to his domicile, the Court gleans from his jurisdictional allegations that he considers himself a "citizen" of the state of Kansas for diversity purposes in this action.  In the event, however,  that Plaintiff *resided* in Kansas but was actually *domiciled* in a state other than Kansas when he commenced this action on December 14, 2010, he is directed forthwith to inform the Court and (1) seek leave to amend his Complaint and/or (2) file with the Court an affidavit regarding the state of his domicile, and hence citizenship at the commencement of the action.[13]  *See, e.g.,  Universal Licensing Corp. v. Lungo*, 293 F.3d 579, 581 (2d Cir. 2002)( "In an action in which jurisdiction is premised on diversity of citizenship, diversity must exist at the time the action is commenced.").

Defendant KOC is a specially chartered corporation organized and existing under the laws of the State of Connecticut, with a principal place of business located at 1 Columbus Plaza, New Haven, Connecticut 06519.  *Id.*, ¶ 2.   Pursuant to 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."   Accordingly, for diversity purposes in this action, defendant KOC is a citizen of the State of Connecticut.[14]

---

[13]  *See*, e.g., *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir.2006) (noting  that it  is incumbent upon a federal court to determine with certainty whether it has subject matter jurisdiction over a case pending before it).

[14]  Both parties have reviewed the Complaint and have made no challenges in their papers as to the stated citizenship of the parties. Moreover, there is no indication that Plaintiff ever lived, much less was ever  domiciled, in Connecticut, KOC's state of citizenship, at any time; and diversity exists where the plaintiff's citizenship is diverse from that of all defendants, *St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80  (2d Cir. 2005) . The Court will address the pending motions, accepting Plaintiff's jurisdictional allegations in the Complaint. Should these facts later be amended or challenged by either party, the Court will once again assess

In his Complaint, Plaintiff seeks damages "in excess of $5 million." *Id.*, ¶ 3. Such damages arise from, *inter alia*, Plaintiff's ensuing "severe and permanent physical and psychological injuries, including, but not limited to,  chemical addictions, nightmares, depression, anxiety, suicidal tendencies, lack of trust, anger, shame, embarrassment, guilt, and low self-esteem." *Id.*, ¶ 22. In light of alleged damages well in excess of $75,000, the Court finds that the  requisite jurisdictional amount under 28 U.S.C. §1332(a)(1) has been met.   Neither  party has contested the alleged facts which give rise to the Court's subject matter jurisdiction over this matter.

## IV.     STANDARD OF REVIEW - RULE 12(b)(6) MOTION TO DISMISS

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'" *Halebian v. Berv*,  644 F.3d 122, 130  (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir.2006) (emphasis omitted)).[15]   Put simply, in ruling on a Rule 12 (b)(6) motion, the court "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support

---

its subject matter jurisdiction.  Plaintiff is reminded that absent proper subject matter jurisdiction, a court must dismiss an action.   *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[15]   Rule 8 of the Federal Rules of Civil Procedure mandates that a complaint "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

it." *Global Network Commc'ns, Inc.*, 458 F.3d at 155.[16]

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Second Circuit has adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal*. *See Gibbons v. Malone*, 703 F.3d. 595, 599 (2d Cir. 2013) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.") (citing and quoting *Iqbal*, 556 U.S. at 678); *Absolute Activist Value Master Fund, Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (same).

In deciding whether to grant a Rule 12(b)(6) dismissal, the court construes the complaint liberally, "accepting all well-pleaded factual allegations in the complaint as true and drawing all inferences in favor of the plaintiff."[17] *See Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011)(citing *Twombly*, 550 U.S. at 555–56). *See also Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)); *MLSMK Inv. Co. v. JP Morgan Chase & Co.*,651 F.3d 268, 273 (2d Cir. 2011); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002). "[W]hether a complaint states

---

[16]   *Accord Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011) (the court's task in ruling on a Rule 12 (b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof") (quoting *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). *See also Festa v. Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir. 1990) (the "court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient'').

[17]   "Although the general rule is that a district court may not look outside the complaint and the documents attached thereto in ruling on a Rule 12(b)[(6)] motion to dismiss, [the Second Circuit has] acknowledged that the court 'may also consider matters of which judicial notice may be taken.'" *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (quoting *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991)).

a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.  When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  556 U.S. at 664, 679.  Thus, factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

 "Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  *See also  Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir. 2011) (same).    The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir.2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir.2008) (Sotomayor, J.) (internal quotation marks omitted)).  In sum, "[t]hreadbare  recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).    Rule 8 of the Federal Rules of Civil Procedure  simply "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79. *See also* n. 15, *supra*.

A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *accord Gibbons*, 703 F.3d at 599.   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*,  556 U.S. at 678.  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the

line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (brackets omitted)).  *See also Twombly*, 550 U.S. at 555 (to survive Rule 12(b)(6) motion, claim's factual allegations must raise "a right to relief above the speculative level on the assumption that all allegations in the complaint are true").

Procedurally, "a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  With respect to timeliness of the complaint in particular, "the current trend in the cases is to allow [the statute of limitations defense] to be raised by motion to dismiss under Rule 12(b)(6) when the defect appears on the face of the complaint."  *Staehr*, 547 F.3d at 425-26 (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §1226 (3d ed. 2004)).  This trend comports with the rule that allegations regarding time are "material when testing the sufficiency of a pleading."  *Staehr*, 547 F.3d at 426 (quoting Fed. R. Civ. P. 9(f)).

## V.    DISCUSSION

### A.    Applicable Statute of Limitations - Texas or Connecticut

Defendant KOC has moved this Court to dismiss Plaintiff's negligence action on the ground that it is barred by the Texas two-year statute of limitations for negligence claims.[18]  Doc. #18, p. 16 (citing *Doe v. St. Stephen's Episcopal Sch.*, 382 F. App'x 386, 388 & n.3 (5th Cir. 2010) ("The statute of limitations for civil conspiracy, negligence, and negligent misrepresentation is two years from the date of the accrual of the claim."); and Tex. Civ. Prac. & Rem. Code § 16.003).    Although "the [Texas state] statute of limitations is tolled until the child turns eighteen" when the "victim is a

---

[18]  Defendant's argument is premised on its assertion that, applying the requisite choice of law rules, this Court should apply Texas substantive and procedural law.

child," defendant maintains that Plaintiff's negligence action – filed in December 2010, twenty-four years after he turned eighteen in 1986 – is untimely and thus barred.[19]  Doc. #18, p. 16-17.

The Court notes preliminarily, as Judge Underhill observed in *Dennany v. Knights of Columbus*, No. 3:10cv1961 (SRU), 2011 WL 3490039 (D.Conn. Aug. 10, 2011), that  the "Texas Court of Appeals [has] held that the state's *five-year* limitations period applied in an action against a third party of negligently permitting an employee to sexually assault the plaintiff" – *i.e.*, facts similar to those at hand.  2011 WL 3490039, at *3 (emphasis added) (citing *Stephanie M. v. Coptic Orthodox Partriarche Diocese of S. U.S.*, 362 S.W.3d 656, 659-61 (Tex.App. 2011)).  Texas thus currently imposes a five-year statute of limitations for personal injury claims arising from intentional sexual abuse.   Tex. Civ. Prac. & Rem. Code § 16.0045.[20]  In any event, even applying this longer five-year limit, Plaintiff's negligence action would still be barred under Texas law.

Plaintiff counters, arguing that Connecticut's 30-year statute of limitations for intentional

---

[19]  Under Texas law, a minor "younger than 18 years of age"  is labeled as  being "under a legal disability," such that "when the cause of action [for injury due to sexual abuse] accrues, the time of disability is not included  in the limitations period."  Tex. Civ. Prac. & Rem. Code Ann. §16.001 (a)-(b).

[20]  Texas  Civil  Practice  &  Remedies  Code  §  16.0045,   entitled,  "Five-Year  Limitations Period," states in pertinent part:

(a) A person must bring suit for personal injury not later than five years after the day the cause of action accrues if the injury arises as a result of conduct that violates:

(1) Section 22.011, Penal Code (sexual assault);

(2) Section 22.021, Penal Code (aggravated sexual assault);

(3) Section 21.02, Penal Code (continuous sexual abuse of young child or children) . . . .

Tex. Civ. Prac. &  Rem. Code § 16.0045 (a)(1)-(3).

sexual abuse to a child applies to this action.  Doc. #21, p. 15  (citing Conn. Gen. Stat. § 52-577d).[21]

Having filed his negligence action well within the requisite 30-year period, Plaintiff claims that his

action is patently timely.  The Court must therefore examine which state statute of limitations  is

applicable to this action.

### 1.  Choice of Laws - Substantive

"When a federal district court sits in diversity, it generally applies the law of the state in

which its sits, including that state's choice of law rules."  *In re Coudert Bros. LLP*, 673 F.3d 180,

186-87 (2d Cir. 2012)  (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941)).

*Accord Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("The district court was

sitting in diversity, and so it properly applied the choice of law rules of . . . the forum in which it

sits.").  Because this Court sits in Connecticut, Connecticut is the relevant forum.  Connecticut

applies the substantive law of the state with the most significant relationship to the lawsuit. *Jaiguay*

*v. Vasquez*, 287 Conn. 323, 349 (2008).  *See also Glenwood Systems, LLC v. Med-Pro Ideal*

*Solutions, Inc.,* 438 F. App'x 27, 29  (2d Cir. 2011); *Almonte v. New York Medical College*, 851

F.Supp. 34, 39 (D.Conn. 1994) (citing *O'Connor v. O'Connor*, 201 Conn. 632, 650 (1986) (quoting

Restatement (Second) Conflicts of Laws § 145)).

To determine the forum with the most significant relationship in the context of a tort case,

---

[21]  Conn. Gen. Stat.  § 52-577d, captioned, "Limitation of action for damages to minor caused by sexual abuse, exploitation or assault," provides:

> Notwithstanding the provisions of section 52-577, no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than thirty years from the date such person attains the age of majority.

the court considers " (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *O'Connor*, 201 Conn. at 652 (quoting Restatement (Second) Conflicts of Law § 145(2) and citing *id.*, §6).

The Court must consider such contacts in the context of the relevant policies and interests of the jurisdictions involved. *MM Global Servs., Inc. v. Dow Chemical Co.*, 283 F. Supp. 2d 689, 703 (D.Conn. 2003). The significance, rather than the quantity, of the contacts determines the choice of law under the Restatement §145(2). *O'Connor*, 201 Conn. at 652-653.

In the case at bar, there are contacts with both states, Texas and Connecticut. With respect to Texas, it is the state where Plaintiff was allegedly primarily subjected to injury from Rivera's sexual abuse.[22] *See, e.g.,* Doc. #1, ¶ 17 (sexual abuse of plaintiff "occurred in the local [KOC] hall where the Columbian Squires met, as well as Rivera's office and apartment"). Texas is thus also the location where Rivera's conduct caused the alleged injuries. Moreover, during the relevant years of abuse, Texas was the state where Plaintiff was domiciled.

In contrast, Connecticut contacts include the place of incorporation and the principal place of business of defendant KOC, the party who allegedly failed to use reasonable care to supervise Rivera and/or protect Plaintiff from being abused by him. According to Plaintiff, Connecticut is the state from which  KOC administers all of its subordinate programs, including the units of its

---

[22] Although Plaintiff asserted that he was sexually abused by Rivera "at multiple locations in the United States on overnight trips" to KOC local and national events, Plaintiff did not specify the particular states.  It is thus unknown whether any of the abusive activities occurred in Connecticut.  Doc. #1, ¶ 17.

youth program, Columbian Squires, throughout the United States.  Doc. #1, ¶ 9 ("Each council is a direct subordinate organization under the direction and control of the [KOC] headquarters in Connecticut."); *id.*, ¶ 10 ("A Columbian Squires unit must operate within the structure and regulations of the [KOC].").

Connecticut is also the state from which the Supreme Advocate orchestrated the December 2009 "agreements" with Plaintiff.  In fact, the purported "Settlement Agreement and Full Release," herein addressed as the "Release," states in its first paragraph that the agreement is between Plaintiff and "Knights of Columbus, a specially-chartered *Connecticut Corporation* with its principal place of business located at One Columbus Plaza, New Haven, *Connecticut*." Doc. #1, Ex. A (introductory paragraph) (emphasis added).  The KOC address in  New Haven reappears in the "agreement" at paragraph 5 of the "Confidentiality" provisions, requiring the Plaintiff to "immediately contact the Knight[s] of Columbus Supreme Advocate at the Supreme Office *in New Haven, Connecticut*" if Plaintiff is ever "served or notified of a subpoena or other document request" with respect to the terms of the agreement at issue.   *Id.*, ¶ 5 (emphasis added).

In examining the location where the relationship between the parties was centered, it appears Plaintiff's relationship with Rivera was centered in Texas.  However, the administration and/or supervision of the Columbian Squires Brownsville unit by the KOC was under the direction and control of the  "Supreme Office" in New Haven, Connecticut.

Weighing the aforesaid factors in their entirety,  the Court finds that the balance weighs in favor of Texas as the state with the most significant relationship to the tort at hand, the intentional sexual abuse of the minor Plaintiff.   As stated above, Texas is the location where most of the allegedly abusive conduct occurred and thus the place where the injuries occurred.  Under the most

significant relationship test, I find that Texas substantive law applies.

## 2.   **Choice of Laws - Procedural**

Nonetheless, such a determination does not resolve the issue of the applicable statute of limitations. "Where a statute of limitation is considered *procedural*, the law of the forum applies." *Icahn v. Todtman, Nachamie, Spizz & Johns, P.C.,* No. 99 CIV 11783(WHP), 2001 WL 1160582, at *5 (S.D.N.Y. Oct. 1, 2001) (citing *Somahomo v. Somahomo,* 29 Conn. App. 392, 393 (1992) ("The established law of this state is that the statute of limitations is procedural and, therefore, the law of the forum applies.").  *See also  Champagne v. Raybestos-Manhattan, Inc*., 212 Conn. 509, 525, 562 A.2d 1100 (1989) ("A statute of limitations is generally considered to be procedural, especially where the statute contains only a limitation as to time with respect to a right of action and does not itself create the right of action.") (internal quotations and citation omitted); *Messler v. Barnes Group., Inc.*, No. CV 960560004, 1999 WL 61034, at *3 (Conn. Super. Feb. 1, 1999) (Connecticut courts will "apply the procedural law of the forum state irrespective of the applicable body of substantive law.") .

Thus, even if the Court applies Texas *substantive* law with respect to the elements of the tort at hand, the Court must still determine the applicable *procedural* law, including the relevant statute of limitations. *See Dennany*, 2011 WL 3490039, at *3 ("Although it is clear that Texas law governs this case, it remains disputed whether Texas law controls the statute of limitations.").

Because statutes of limitations are labeled "procedural" under Connecticut law, Connecticut courts traditionally apply Connecticut's statute of limitations when the plaintiff pursues a common

law cause of action.[23]  *Id.*  (citing *Stuart & Sons, L.P. v. Curtis Pub. Co.*, 456 F.Supp.2d 336, 343 (D.Conn. 2006) ("Under Connecticut's choice of law rules, if the underlying claim existed at common law, the statute of limitations is considered procedural.").  *See also Landry v. Potter,* No. 3:04cv380 (MRK), 2005 U.S. Dist. LEXIS 1690 , at *4 (D. Conn. Jan. 27, 2005)("As a consequence, Connecticut federal courts have uniformly held that Connecticut's statutes of limitations ordinarily will govern in diversity actions such as the present case."); *Slekis v. Nat'l R.R. Passenger Corp.,* 56 F. Supp. 2d 202, 204  (D. Conn. 1999)  ("Under Connecticut law, statutes of limitations are considered procedural and thus Connecticut's own statutes of limitations will usually govern claims asserted in federal diversity cases in Connecticut."); *Lostritto v. Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 22 (2004) ("A statute of limitations is generally considered to be procedural, especially where the statute contains only a limitation as to time with respect to a right of action and does not itself create the right of action."); *Baxter v. Sturm, Ruger and Co., Inc.,* 230 Conn. 335, 339-40 (1994) ("statutes of limitation relate to the remedy as distinguished from the right" and "[i]t is undisputed that, as a principle of universal application, remedies and modes of procedure depend upon the lex fori") (internal citations omitted); *Roberts v. Caton*, 224 Conn. 483, 488 (1993) ("Statutes of limitation are generally considered to be procedural, especially where the statute contains only a limitation as to time with respect to a right of action and does not itself create

---

[23]  As the court explained in  *Bilodeau v. Vlack*, No. 07-CV-1178 (JCH),  2009 WL 1505571 (D.Conn.  May 20, 2009), "[t]he only exception to this general rule is in cases where the cause of action "did not exist at common law and, the foreign statute of limitations is so interwoven with the statute creating the cause of action" that it 'becomes one of the elements necessary to establish the right....'" 2009 WL 1505571, at *3  (quoting *Landry v. Potter*, 3:04cv380 (MRK), 2005 U.S. Dist. LEXIS 1690, at  *6 (D. Conn.2005) (internal quotations omitted)).  Moreover, "[t]he facts here do not satisfy the exception to the traditional rule" where, as here, the "Complaint alleges negligence," a cause of action "found at common law and not created by statute."  *Bilodeau*, 2009 WL 1505571, at *3.

the right of action."); *Champagne*, 212 Conn. at 525 (where  a right of action is created by the common law, the statute of limitations "must be considered procedural").   *Accord   Icahn v. Todtman, Nachamie, Spizz & Johns, P.C.*, No. 99 CIV 11783(WHP), 2001 WL 1160582, at *5 (S.D.N.Y. Oct. 2, 2001) (in Connecticut, "[a] statute of limitation is generally considered to be procedural, especially where the statute contains only a limitation as to time with respect to a right of action and does not itself create the right of action") (citing and quoting *Jones Destruction, Inc. v. Upjohn*, 161 Conn. 191, 195 (1971) and collecting cases).

Moreover, under Connecticut law, "unless specifically tied to a statutory right of action or unless a contrary legislative intent is expressed, the statute of limitations in effect at the time an action is filed governs the timeliness of the claim." *See Roberts*, 224 Conn. at 488-89 (citing *Andrulat v. Brook Hollow Associates*, 176 Conn. 409, 413 (1979) and *Bohun v. Kinasz*, 124 Conn. 543, 547 (1938)).

With respect to the particular statute of limitations at issue for intentional sexual abuse, Conn. Gen. Stat. § 52-577d, a judge of this District has previously held that "§ 52-577d is not substantive, for it does not create a right of action to recover damages for sexual misconduct, but merely creates the appropriate statute of limitations for such [a] claim." *Borawick v. Shay*, No. 5:92 CV 00033 (TFGD), 1993 WL 127087, at * 3 (D.Conn. Jan.  27, 1993) (Daly, J.).   Similarly, "the Supreme Court of Connecticut has ruled that section 52-577d is procedural and not substantive." *Bilodeau v. Vlack*, No. 07-CV-1178 (JCH),  2009 WL 1505571, at *3 (D.Conn.  May 20, 2009) (citing *Roberts*, 224 Conn. at 492 (finding section 52-577d as amended did not create a substantive change in the law that would preclude its retroactive application)).

Despite the cited case law, KOC  urges this Court to follow "the emerging trend" discussed

in *Phillips v. Scott*, 446 F.Supp.2d 70. 83, n.25 (D.Conn. 2006), of "select[ing] the state whose law will be applied to the issue of limitations by a process essentially similar to that used in the case of other issues of choice of law" – "a test similar to the most significant relationship test" in the Restatement (Second) [of Conflict of Laws] § 142." [24]  Doc. #18, p. 14-15.  Under Section 142, barring "exceptional circumstances" that would make the "result unreasonable," "[t]he forum will apply its own statute of limitations permitting the claim unless: (a) maintenance of the claim would serve no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence." 1 Restatement (Second), Conflict of Laws § 142 (1989 pocket part).

An examination of *Phillips v. Scott*  reveals that it was an exceptional  case, based on extraordinary facts, rather than one designed to set new  precedent.  In *Phillips*, plaintiff brought an unjust enrichment claim which arose in California, involving an oral agreement he entered with his mother in California concerning his acquisition of  California real estate.  The only fact connecting the action with Connecticut was the mother's move to that state prior to her death.  Under such extraordinary circumstances, the Court applied the California statute of limitations.

Furthermore, the Court in *Phillips* specified that even if it had applied Connecticut law to the action at hand, the action would have remained time-barred.  The Court thus explained: "Although

---

[24] *See also Dennany v. Knights of Columbus*, No. 3:10cv1961 (SRU),  2011 WL 3490039, at *3 (D. Conn. Aug. 10, 2011) (noting in  dicta that "there have been several recent district court decisions rejecting the traditional approach and instead applying the statute of limitations of the state with the most significant relationship to the suit, consistent with the Restatement (Second) of Conflict of Laws").

California's governing statute of limitations is substantially shorter than the applicable statute of limitations in Connecticut, *see* CONN. GEN.STAT. § 52–576, even if Connecticut's six year statute of limitations were applied, plaintiff's claim would still be barred as his claim . . . *, accrued on May 2, 1998 and he did not initiate the current action until December 1, 2004. The foregoing notwithstanding, in light of the decision reached [herein], *supra, further analysis of the application of Connecticut law need not be addressed*."  446 F.Supp.2d at 84, n.25 (emphasis added).

Defendant also  cites *Advest Inc. v. Wachtel*, 235 Conn. 559, 668 (1995), in an attempt to persuade the Court that "'[i]f a state has no constitutional or statutory directive as to its choice of law, the forum court should consider the following factors: '(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law being applied.'" Doc. #18, p. 15 (quoting *Advest Inc.*, 235 Conn. at 568 n.9, which in turn quoted 1 Restatement (Second), Conflict of Laws § 6 and cited *O'Connor v. O'Connor*, 201 Conn. 632, 650–51 (1986)).

The court in *Advest*, however, did not address the proper choice of procedural law in a Connecticut forum.  In *Advest*, plaintiff securities dealers appealed from the trial court's judgment denying their application to permanently enjoin nine defendant investors from bringing an arbitration claim in the state of New York.  The arbitration claim had been adjudicated in the trial court  as precluded under the applicable Connecticut three-year statute of limitations, Conn. Gen. Stat. § 52-577.  On appeal, in determining whether the trial court's denial of the injunction was an abuse of

25

discretion, the Supreme Court discussed the issue of whether New York would thereafter permit the arbitration claim to proceed in New York. *With respect to the state of New York* , the Court thus mentioned the Restatement Conflict of Laws §6 as it related to "whether the New York forum will apply Connecticut's statute of limitations" and concluded that it would "depend upon New York's choice of law." 235 Conn. at 568. The Connecticut Supreme Court ultimately affirmed the denial of the injunction, holding that the bar of Connecticut's statute of limitations was not final on the merits and thus did not preclude, under *res judicata*, an action in New York where the limitations period had not yet expired. Moreover, the *Advest* court made clear that "whether a final judgment in this state based upon the statute of limitations bars the maintenance of an action in the forum state that has a longer statute of limitations *depends upon the forum state's choice of law*." *Id.* at 569 (emphasis added).

In the present action, the applicable forum is Connecticut and this Court must therefore apply Connecticut's choice of law rules, which generally treat statutes of limitations as procedural in nature. No Connecticut case, including *O'Connor v. O'Connor*, 201 Conn. 632 (1986), cited as authority in footnote 9 by the *Adves*t court, has given any indication that the present rule, treating statutes of limitations as *procedural* in nature, has been purposefully abrogated. Instead, the "*O'Connor* Court abandoned the automatic application of lex loci delicti when considering choice of *substantive* law application in tort cases." *Bilodeau*, 2009 WL 1505571, at *4 n.6 (emphasis added). *See also Somohano*, 1992 WL 17154, at *2 ("In *O'Connor*, [201 Conn. at 650,] the [Connecticut] supreme court held that § 145 of the Restatement Second of Conflict of Laws would be used to determine a parties' *substantive* rights in a tort action when the application of the doctrine of lex loci would produce an arbitrary, irrational result.")(emphasis added)); *Spencer v. Hartford*

*Fin. Servs. Group, Inc.*, 256 F.R.D. 284, 300 (D.Conn. 2009) (post-*O'Connor* ruling citing

Connecticut Supreme Court's holding in *Baxter,* 230 Conn. 335, to uphold Connecticut's traditional

rule that the statute of limitations for common law claims is considered procedural).[25]

     In Connecticut, the traditional choice of law rules  distinguish between substantive and

procedural law, with the law of the forum, or *lex fori,* controlling those issues which are construed

as governing procedure.  *Morris Plan Industrial Bank v. Richards*, 131 Conn. 671, 673 (1945); *Orr*

*v. Ahearn*, 107 Conn. 174, 176 (1928).   Moreover, as stated *supra* herein, "[i]t is a well settled

principal of law in Connecticut that '[a] statute of limitations is generally considered to be

procedural, especially where the statute contains only a limitation as to the time with respect to a

right of action and does not itself create the right of action." *Champagne*, 212 Conn. at 525 (citations

omitted).

     The exception to that rule, where the action is created by the statute itself, is not present here.

Negligence is a common law claim both in Texas and Connecticut.  Applying the substantive law

of either jurisdiction does not alter the fact that Connecticut procedural law applies.  Absent the lone

---

[25]  In  *Spencer v. Hartford  Fin. Servs. Group*, *Inc.,* 256 F.R.D. 284, 300 (D.Conn. 2009), when confronted with the argument that "Connecticut courts are trending towards following the Restatement's 'most significant relationship' test in place of traditional rules," Judge Janet C. Hall explained:

   [T]he Connecticut Supreme Court's decision in *Baxter [v. Sturm, Ruger and Co., Inc.,* 230 Conn. 335  (1994)]*, which applied Connecticut's traditional choice of law rule that the statute of limitations for common law claims is considered procedural, postdates both *O'Connor* and the 1988 revision to section 142. Until the Connecticut Supreme Court declares otherwise, it is this court's conclusion that it should follow the traditional rule.

*See also Bilodeau*, 2009 WL 1505571, at *5 (recognizing that *Baxter* post-dates "Rest.2d, § 142, comment g" and citing *Baxter*, 230 Conn. at 340, to "hold[] that the traditional rule – that the law of the forum state governs on matters of procedure – applies here").

exception where the relevant action is created by statute and the foreign statute of limitations is essentially interwoven with the statute creating the action, "Connecticut federal courts have uniformly held that Connecticut's statutes of limitations ordinarily will govern in diversity actions such as the present case."[26]  *Landry v. Potter*, No. 3:04CV380 (MRK), 2005 WL 293500, at *1 (D.Conn. Jan. 27, 2005) (collecting cases).   In sum, "[i]n suits with multistate aspects, Connecticut courts (including a federal court sitting in Connecticut) apply Connecticut statutes of limitations." *Drakatos v. Denison*, 493 F.Supp. 942, 944 n.1 (D.Conn.1980).

As Judge Kravitz concluded in *Landry v. Potter*:

[B]ecause Plaintiffs' complaint "sounds in simple negligence, a cause of action recognized at common law and not created by statute," the exception noted above does not apply and therefore, a "Connecticut court would consider the statutes of limitations procedural and would apply the statutes of limitations of the forum, Conn. Gen.Stat. § 52-584." *Slekis [ v. National RR Passenger Corp.*,  56 F.Supp.2d 202,] 205 [(D.Conn.1999)]. Because the Court sits in diversity, we do likewise.

2005 WL 293500, at * 2.  *Accord Oy v. Hr Textron, Inc.*, No. 3:08-cv-1216 (WWE), 2008 WL 5214268, at *3 (D.Conn. Dec. 11, 2008) ("[T]he Connecticut Supreme Court observed that a statute of limitations is procedural with regard to a common law cause of action, as contrasted to a statutory cause of action in which it is a substantive element. Therefore, as to plaintiff's common law claims, the Connecticut statute of limitations will apply regardless of the substantive law that should govern the dispute.") (internal citations omitted); *Davies v. Jindal,* No. 3:03 CV 341(CFD),  2007 WL 1491305, at *4 (D.Conn. May 22, 2007) ("Connecticut federal courts have uniformly held that

---

[26] *Cf.  Feldt v. Sturm, Ruger & Co.*, 721 F.Supp. 403, 406 (D.Conn.1989) (where Georgia products liability statute created strict liability *unknown at common law*, "Georgia products liability statute of repose [held to be] so interwoven with the statute creating the cause of action" that the limitation must be considered substantive") (internal quotations and citation omitted).

Connecticut's statutes of limitations ordinarily will govern in diversity actions.")(quoting *Landry*, 2005 WL 293500, at *1).

Accordingly, this Court, sitting in diversity, will apply Connecticut's 30-year statute of limitations for an "action for damages to [a] minor caused by sexual abuse, exploitation or assault" to the negligence action in suit.[27]  Under that statute, Plaintiff's injury did not accrue until he reached 18 years old – *i.e.,* "attain[ed] the age of majority, Conn. Gen. Stat. § 52-577d –  in 1986.  He brought his action in 2010, twenty-four years later, and thus within the prescribed 30 years. Consequently, Defendant's motion to dismiss with respect to timeliness of Plaintiff's claim will  be denied.[28]

_____

[27]   The Court  also  notes, though  the parties do not address, that "the Connecticut statute of limitations [also] applies to state law fraud claims." *Spencer,* 256 F.R.D. at 300.   Plaintiff's second cause of action for declaratory relief encompasses the common law torts of fraud and misrepresentation. Said claim arose on December 23, 2009 and this action was filed on December 14, 2010, slightly less than one year after it accrued.  "In Connecticut, the three year statute of limitations for actions grounded in tort is generally applied to actions for fraud and deception." *Einbinder & Young, P.C. v. Soiltesting, Inc.*, 36 Conn.Supp. 277, 279, 418 A.2d 95 (1980).  *See* Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of.").   Plaintiff's claim for declaratory relief in Count Two is thus timely.

[28] Even were this Court to break with Connecticut's general rule to  apply the Restatement (Second) of Conflict of Laws at §§6 & 142, the Connecticut statute of limitations would still potentially apply in this action  because, barring "exceptional circumstances" that would make the "result unreasonable," "[t]he forum will apply its own statute of limitations permitting the claim unless: (a) maintenance of the maintenance of the claim would serve no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence." 1 Restatement (Second), Conflict of Laws § 142 (1989 pocket part).  Here, Texas arguably possesses  a more significant relationship to the parties and occurrences and would bar the common law actions. Nonetheless, Connecticut would arguably have a "substantial interest" in whether or not a Connecticut corporation, headquartered with its principal place of business in Connecticut, directs and controls a national boys' youth program in which numerous minors are horribly and repeatedly sexually abused by the program's leaders at official meetings and functions.  Therefore, even if the Court were to find that Texas has a "more significant relationship" to the parties and the particular occurrence, the Court might, pursuant to the Restatement (Second) § 6, apply Connecticut's procedural statute of limitations to

B.   **Foreseeability in Negligence**

1.   **Texas Law**

Defendant next moves for dismissal of Plaintiff's negligence action on the grounds that he has failed "to allege any *facts* that would support a finding that the injuries to Plaintiff were foreseeable to the Knights [of Columbus]." Doc. #18, p. 17 (emphasis in original).   Under the substantive law of Texas, the state with the most significant relationship to the tort at hand, the requisite elements of a negligence action are: "1) a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages proximately resulting from the breach.*"  Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).  *See also Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).  Thus, as Defendant contends,  in order to establish a negligence claim against KOC, Plaintiff must plead that (1) KOC owed him a legal duty to protect him from Rivera's actions, (2) KOC breached that duty, and (3) Plaintiff sustained damages proximately caused by the breach.  Doc. #18, p. 17 (citing *Houser v. Smith*, 968 S.W.2d 542, 544 (Tex.App. - Austin 1998, no pet.)).  *See also Amaya v. Potter*, 94 S.W.3d 856, 861 (Tex.App. - Eastland 2002) ("Tort liability depends on both the existence and the violation of a duty.").

"The threshold inquiry in a negligence case is duty." *Greater Houston Transp. Co.*,  801 S.W.2d at  525.  *See also  Graff v. Beard,* 858 S.W.2d 918, 919 (Tex. 1993) ("It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability.") (citing *Greater Houston Transp. Co.*, 801 S.W.2d at 525).  *See also  Abalos v. Oil Dev. Co. of Texas*,  544 S.W.2d 627, 631 (Tex. 1976)("[A]ny plaintiff must prove the existence and violation of a legal duty owed

---

allow the claim to proceed.    However, the Court applies the Connecticut statue of limitations for the reasons stated in text, and need not reach this particular issue.

to him by the defendant to establish tort liability. The threshold question, therefore, is whether [defendant] was under a duty to [plaintiff].”); *Rosas v. Buddie’s Food Store,* 518 S.W.2d 534, 536 (Tex. 1975) (“Negligence is no more than breach of a legal duty; the tort becomes actionable when the breach causes injury.”).

Whether a duty exists in a particular case “is a question of law for the court to decide from the facts surrounding the occurrence in question.” *Greater Houston Transp. Co.,* 801 S.W.2d at 525 (citing *Otis Eng’g Corp. v. Clark*, 668 S.W.2d 307, 312 (Tex.1983)). *See also SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 351 (Tex. 1995) (“The existence of a legal duty is, of course, a question of law.”).  “In determining whether the defendant was under a duty, the court will consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor’s conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant.” *Greater Houston Transp. Co.,* 801 S.W.2d at 525 (citing *Otis Eng’g Corp*., 668 S.W.2d at 309).  *Accord Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 n.26 (Tex. 2010).   The Texas Supreme Court also considers public policy factors, described as “any other relevant competing individual and social interests implicated by the facts of the case.” *Tex. Home Mgmt., Inc.  v. Peavy*, 89 S.W.3d 30, 33-34 (Tex. 2002).   Of all requisite factors, “foreseeability of the risk is the foremost and dominant consideration.” *Greater Houston Transp. Co.,* 801 S.W.2d at 525  (internal quotations and citation omitted).

Each person has a general duty to exercise reasonable care to avoid foreseeable injury to others. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987), *superseded by statute*, Tex. Alco. Bev. Code Ann. §§ 2.01–2.03 (West 1995).  As the Texas Appellate Court explained in *Amaya v. Potter*:

31

> Foreseeability means that a person of ordinary intelligence would have anticipated the danger his or her negligence creates. Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. Proximate cause incorporates two elements: cause in fact and foreseeability. The test for cause in fact, or "but-for cause," is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred.

94 S.W.3d at 861 (internal citations omitted).   As noted above, "foreseeability is a component of both duty and proximate cause." *Id.*

Foreseeability "requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d at 478.   *See also Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 549-50 (Tex.1985). "The danger of injury is foreseeable if its general character . . . might reasonably have been anticipated." *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d at 478 (internal quotations and citation omitted).[29]

An examination of foreseeability and proximate cause "generally involves a practical inquiry based on common experience applied to human conduct." *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d at 478 (internal quotations and citation omitted). The question thus becomes "whether the injury might reasonably have been contemplated as a result of the defendant's conduct." *Id.*

---

[29]   *See also  Walker v. Harris,* 924 S.W.2d 375, 377 (Tex. 1996) ("Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable.") (internal citations omitted)*; Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) (foreseeability does not require the actor to anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence);  *Berly v. D & L Sec. Services and Investigations, Inc.*,  876 S.W.2d 179, 183 (Tex.App.–Dallas 1994) ("All that is required is that the injury be of such a general character as might reasonably have been anticipated, and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.") (citing  *Nixon*, 690 S.W.2d at 551)).

Moreover, "[f]oreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Id.* (citing  Restatement (Second) of Torts § 435(2) (1965)).

### 2.        Defendant's Argument

With respect to the pending motion, KOC argues that "Texas courts have consistently rejected cases against organizations regarding the alleged sexual abuse of minors by an employee or volunteer when there was nothing in the record to indicate that the organization had a specific reason to know that its employee or volunteer was likely to commit the alleged abuse."  Doc #18, p. 18.  In support KOC cites, *inter alia*,  *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995), which focused on whether "if the Boys Club had investigated [its leader's] criminal record," the resulting information would have "caused the club reasonably to anticipate his subsequent sexual assaults on the minor plaintiffs." 907 S.W.2d at 478.

In *Doe v. Boys Club of Greater Dallas, Inc.*, the plaintiffs, grandparents of abused minor boys, sought damages based on the sexual molestation of their grandsons by an adult named Mullens, who worked as a volunteer at the Boys Club.  *Id.* at 476.  Among the plaintiffs' claims, they alleged that the Boys Club negligently accepted Mullens as a volunteer without investigating  or screening him, negligently failed to supervise him, failed to disclose material information about Mullens, misrepresented that the club thoroughly investigated its volunteers, and misrepresented that the club and its workers had characteristics they did not have. The trial court granted the Boys Club's motion for summary judgment and severed the action against the club from the action against Mullens.  The Court of Appeals affirmed summary judgment for the Boys Club.  *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d 942 (Tex.App.–Amarillo 1994).   With respect to the negligence claims,

33

it ruled that the Boys Club did in fact owe a duty of reasonable care in selecting its workers, including volunteers like Mullens.  868 S.W.2d at 951-52.  However, as a matter of law, the Boys Club could not reasonably foresee Mullens' assaults on the boys so there was no proximate cause. *Id.*

Plaintiffs appealed that decision to the Texas Supreme Court. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995).  The plaintiffs once again contended that the Boys Club was negligent in its failure to investigate Mullens because a background check would have revealed his two prior misdemeanor convictions for driving while intoxicated.   They also argued that the Boys Club had negligently supervised Mullens in his work as a volunteer.

The Texas Supreme Court affirmed summary judgment for the Boys Club on the basis of proximate cause, concluding that Mullens' "prior DWI convictions did not indicate criminal conduct in any way akin to sexual assault of young boys." 907 S.W.2d at 478.  Thus, even if the Boys Club breached its duty to investigate or screen Mullens, that failure was not the "proximate cause of the boys' injuries."  *Id.* At 477.   "There [was] no evidence that the Boys Club would not have taken Mullens as a volunteer if it had known he had been convicted for driving while intoxicated." *Id.* at 477-78.  "Mullen's prior record could not have caused the Boys Club reasonably to anticipate the danger he presented to the plaintiffs." *Id.* at 478.

Furthermore, the Texas Supreme Court held that "since there [was] no evidence that Mullens molested or assaulted any boys *at the club's premises*, there [was] no evidence the Boys Club's alleged failure to supervise was a producing cause of the injuries to [the plaintiffs' grandsons]." *Id.* at 478 (emphasis added).  Specifically, all alleged  assaults on the boys took place outside of the premises of the Boys Club, on private fishing and camping trips that "were not Boys Club-sponsored

events." *Id.* at 481.

Thus, in *Doe v. Boys Club of Greater Dallas, Inc.*, the Texas Supreme Court reviewed the evidence presented on summary judgment in determining that, even "if the Boys Club breached a duty to investigate, screen, or supervise volunteers, this breach was not the cause in fact of the plaintiffs' injuries." *Id.* at 477.

KOC also cites *Doe v. Catholic Soc. of Religious and Literary Educ.*, No. H-09-1059, 2010 WL 345926, at *10 (S.D. Tex. Jan. 22, 2010), as authority for a lack of foreseeability where the organization had no specific reason to know that its employee was likely to commit the alleged abuse. In that case, a Catholic high school was sued by a former student for negligent failure to protect him against the reasonably foreseeable harm of sexual abuse by his teacher, Beeler. The court granted summary judgment to the high school because there was "no evidence in the record that [the school] Strake Jesuit had actual knowledge that [the teacher] Beeler was a risk to students." 2010 WL 345926, at *10. There had been no complaints to the school made by students, Beeler had no criminal history, and much of the abuse took place at the student's home when Beeler was invited by the plaintiff's parents to stay as a "sitter" while the parents were away on "week-long or even shorter business trips" and to drive plaintiff to and from school. *Id.*, at *3.

Both of KOC's cited cases, *Doe v. Boys Club of Greater Dallas, Inc.* and *Doe v. Catholic Soc. of Religious and Literary Educ.*, are distinguishable from the one in suit on two grounds. First, neither court examined the adequacy of the complaint on a Rule 12(b)(6) motion, *i.e.*, whether plaintiffs' allegations failed to state a claim for negligence. Rather, the courts addressed summary judgment motions and thus focused on the *evidence presented* to determine whether "there [was] no genuine dispute as to any material fact and the movant [was] entitled to judgment as a matter,"

Fed. R. Civ. P. 56(a).  Here, KOC has moved for dismissal of Plaintiff's negligence action as inadequately *pled* so there is no issue regarding an adequate factual basis to sustain his claim. Discovery has not closed and KOC has not, in the context of a 12(b)(6) motion, filed any stipulated facts, affidavits, or extraneous materials for the Court's consideration.

Second, both cited cases are factually dissimilar from the present case in that the leaders in those cases assaulted the boys *at private events.*  Mullens in *Doe v. Boys Club of Greater Dallas, Inc.* assaulted the boys on private camping and fishing trips;  and Beeler, the offending teacher in *Doe v. Catholic Soc. of Religious and Literary Educ.,* abused the plaintiff in his home. In contrast, in the case in suit, Plaintiff has alleged that  Rivera abused him at the KOC hall and also on KOC-sponsored trips to local and national Squires events.  Doc. #1, ¶17. Under the alleged circumstances, one could reasonably conclude that KOC knew or reasonably should have known of the general danger Rivera  posed to the boys in the Brownsville Squires.  Given the KOC-related settings of abuse, KOC's alleged failure to supervise or investigate Rivera, or to acknowledge what it may have learned, could have proximately caused Plaintiff's alleged injuries.     In sum, the Texas common law has not foreclosed an action for negligent supervision where the injuries occurred *at defendant-sponsored activities and locations*, potentially creating the proximate cause that was lacking in both *Doe v. Boys Club of  Greater Dallas, Inc.* and  *Doe v. Catholic  Soc.  of  Religious  and  Literary Educ.*[30]

---

[30] *See also Escobar v. Goss*, No. 13-07-00536-CV, 2010 WL 1509492, *14-15  (Tex.App. - Corpus Christi, April 15, 2010) (finding proximate cause/foreseeability to affirm judgment that psychiatrist was negligent in medical malpractice case (for failing to involuntarily commit patient and thereby prevent suicide) and distinguishing holding in  *Doe v. Boys Club of Greater Dallas, Inc.* on the basis that counselor who molested boys in *Doe* did so "on overnight camping trips . . . [that were] not organized by the Boys and Girls Club, but personally between the counselor and the [boys'] grandparents," making Boy's Club's failure to supervise the counselor merely "a preliminary

In *Doe v. Norwich Roman Catholic Diocesan Corp.*, 268 F.Supp.2d 139, 148 (D.Conn. 2003), this Court addressed the issue of proximate cause on a Rule 12(b)(6) motion to dismiss a negligence claim in an action by a former parishioner against a priest, a parish, and a diocese for sexual abuse by the priest. In discussing plaintiff's claim against the parish and diocese for negligent hiring and supervision of the priest, the court held that "if improper supervision occurred, that could indicate that Defendants should have known about the alleged misconduct." 268 F.Supp.2d at 147. The court further explained:

> Applying the reasoning of the Restatement [(Second) of Torts § 442B (1965)], we must conclude, . . . that there is a possibility that if Defendants had knowledge regarding Sullivan's [the priest's] misconduct, Defendants could have been a proximate cause of injury to Plaintiff. Therefore, we would need to know what level of knowledge Defendants had about Sullivan's alleged misconduct, because they would only be relieved of liability if Plaintiff's alleged harm was not within the scope of risk created by their conduct.

> At this point we simply do not have enough facts regarding Defendants' knowledge of Sullivan's alleged misconduct to make a determination regarding whether Defendants could have proximately caused the harm. *A motion to dismiss is often ill-suited for disposing of proximate cause without the benefit of evidence indicating the Defendants' knowledge*, see *Deglin v. Norwich Free Acad.*, No. 546339, 1999 WL 231610, at *2 (Conn.Super. Apr. 7, 1999), and it would be would be premature and inappropriate to dismiss the negligence claim at this stage of the pleadings, even though Plaintiff may have difficulty ultimately proving knowledge, and therefore, proximate cause.

268 F.Supp.2d at 148 (emphasis added).

---

condition" to the boys' injuries rather than a "producing cause"); *Scott Fetzer Co. v. Read*, 945 S.W.2d 854, 869 (Tex.App.–Austin 1997) (finding proximate cause/foreseeability to uphold judgment of negligence against manufacturer (for dealer's sexual assault of customer during sale) and distinguishing *Doe v. Boys Club of Greater Dallas, Inc.*, "because the sexual assaults occurred at non-sponsored activities, Mullens' presence at the club was but a preliminary condition in the course of events which made possible his assaults....") (quoting *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d at 478), *reh'g overruled*, 990 S.W.2d 732 (Tex. 1998).

As in the *Norwich* case, with respect to KOC's possible negligence, based on Plaintiff's allegations of pervasive sexual abuse at the KOC hall and KOC sponsored events, there is, as set forth in Part II.B. *supra*, "sufficient information [in the Complaint] from which knowledge [of the Defendant] could be inferred." 268 F.Supp.2d at 147. In the context of a Rule 12(b)(6) motion, rather than a motion for summary judgment, it may be premature, and in fact inappropriate, to dismiss Plaintiff's negligence claim.

### 3.  Plaintiff's Allegations of Negligence

In the Complaint at issue, Plaintiff alleges that KOC failed to protect him "from sexual assault and lewd and lascivious acts committed by Rivera" by, *inter alia*, failing to supervise Rivera in his position.[31] Doc. #1, ¶¶ 25-33.  Plaintiff thus maintains that KOC's failure to properly monitor Rivera gave him the opportunity to repeatedly sexually abuse Plaintiff and others.  "[R]ed flag" behaviors — *e.g.*, distributing pornographic magazines ("Playboy" and "magazines with more graphic sexual depictions, including homosexual activity"), *id.*, ¶13;  plying Plaintiff and other Squires with alcohol and drugs (*e.g.*, whiskey, marijuana, white pills), *id.*, ¶¶14-15, both at KOC meetings and at KOC local and national events, *id.*, ¶17 —  were, Plaintiff alleges, all detectable and preventable with reasonable care via supervision.[32]  Such actions were *per se* abusive and

---

[31] *See, e.g.,* Doc. #1, ¶28  (KOC "knew or in the exercise of reasonable care should have known that Rivera . . . "was unfit, dangerous, and a threat to the health, safety and welfare of the minors entrusted to his counsel, care and protection");  ¶31 (KOC "had inadequate policies and procedures to protect children in the Columbian Squires it was entrusted to care for and protect").

[32] Even assuming *arguendo* that initial screening by KOC prior to appointment of Rivera might not have revealed past misconduct or a propensity for sexually abusive behavior, subsequent supervision (whether through interview of Squires or direct observation) would have easily revealed the alleged ongoing and pervasive sexual abuse by Rivera as leader of the Brownsville Squires.  As the Texas Appellate Court held in *CoTemp, Inc. v. Houston West Corp.*, 222 S.W.3d 487 (Tex.App.–Houston 2007),"[t]he basis of responsibility under the doctrine of negligent retention is

potential red flags of further illicit and injurious conduct.[33]    With respect to "foreseeability," the

Court will now examine duty and proximate cause under the alleged facts.

### 4.    Foreseeability – Duty and Proximate Cause

Accepting as I must on this motion the truth of the well-pleaded factual allegations in the

Complaint, I conclude that, in general,  KOC owed Plaintiff a duty of  care to ensure his welfare as

a Brownsville Squire.  That duty included, *inter alia*,  the responsibility to properly supervise the

Squires' leader, Rivera.   KOC, as a  renowned and long-established religion-based organization,

urges parents to entrust the welfare of their boys, and actively recruits those boys, to dedicate their

formative years to the Columbian Squires, an organization committed to developing leadership

qualities  and  supporting  the  Roman  Catholic  Church.  Doc.  #1,  ¶10.  Having  made  such

_____

the master's negligence in retaining in his employ an incompetent servant whom the master *knows, or by the exercise of reasonable care should have known*, was incompetent or unfit, thereby creating an unreasonable risk of harm to others." 222 S.W.3d at 492 (emphasis added).  After appointing Rivera, KOC's retention of him once KOC knew or reasonably should have known of his abusive conduct toward Plaintiff and other Squires would have violated that duty. *See also Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 796 (Tex.2006) ("Negligence in hiring requires that the employer's 'failure to investigate, screen, or supervise its [hirees] proximately caused the injuries the plaintiffs allege.'") (quoting *Doe v. Boys Club of Greater Dallas, Inc*., 907 S.W.2d at 477)) .

[33] For  Plaintiff's allegations of pervasive abuse by Rivera within the Brownsville Squires program, *see, e.g.*, Doc. #1, ¶ 11 (from attending Squires meetings, Plaintiff "quickly learned that the other children considered Rivera to be a 'cool' leader because he frequently gave them alcohol and encouraged them to drink around him"); ¶ 13 (Rivera gave Plaintiff "Playboy" and other "magazines with more graphic sexual depictions, including homosexual activity"); ¶ 16 (Plaintiff "frequently saw Rivera carrying a firearm" and was threatened by him that he and/or his family would be killed "if [he] did not comply with Rivera's demands for sex"); ¶ 17 ("The horrible, nightmarish sexual abuse occurred at multiple locations in the United States on overnight trips, including many local and national events for the Columbian Squires;" and Plaintiff was sexually abused "in the local Knights of Columbus[]hall where the Columbian Squires met, as well as Rivera's office and apartment"); ¶ 19 (Rivera "'shared' [Plaintiff] with at least one other adult leader of the Columbian Squires in another city").

representations, KOC owed the Squires, such a Plaintiff, a duty to exercise reasonable care to prevent foreseeable injury by overseeing their leader.[34]

As to proximate cause, employing the established analysis of Texas courts to the facts alleged, this Court makes a practical inquiry regarding foreseeability, applying common experience to human conduct, to determine whether the injury might reasonably have been contemplated as a result of the Defendant's conduct.[35]   I conclude that such injury was foreseeable.  In particular, it was foreseeable that, absent proper KOC supervision, a Squires leader with dangerous proclivities – *e.g.*, a predilection for pornography, alcohol, drugs, and pedophilia – might harm the boys in his charge.  Furthermore, in light of Plaintiff's allegations describing Rivera's widespread, repeated and outrageous behavior as Squires leader *at KOC-sponsored events*, I find that it was specifically foreseeable that the boys under his charge would be injured.  Given these alleged facts, KOC either

---

[34] *See, e.g.*, *Welch v. Hurd Oil Field Service, Inc.*, No. 07-08-0160-CV, 2009 WL 1974259, at * 3 (Tex. App. - Amarillo July 9, 2009) ("a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation.") (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000)); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d at 955 ("the agreement to organize recreational activities for the minor [boys' club members] and to properly supervise them during those activities arguably created a fiduciary relationship concerning that transaction" for club associated activities on premises). *See also C.J.C. v. Corporation of Catholic Bishop of Yakima*, 138 Wash.2d 699, 722 (1999) ("As a matter of public policy, the protection of children is a high priority. In general, therefore, we find churches (and other religious organizations) subject to the same duties of reasonable care as would be imposed on any person or entity in selecting and supervising their workers, or protecting vulnerable persons within their custody, so as to prevent reasonably foreseeable harm.").

[35] *See, e.g., Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 737 (Tex. 1998) ("the question of forseeability involves a practical inquiry based on 'common experience applied to human conduct.'"(citing *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d at 478 and quoting *Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex.1987) (internal quotations omitted))

knew or reasonably should have known that Plaintiff was at risk of serious injury.[36] Doc. #1, ¶¶ 13-21. Even if Rivera's particular acts of depravity were not foreseeable to KOC, Rivera's overall pattern of behavior during the years at issue clearly indicated he posed a risk of sexual and substance abuse to Squires such as Plaintiff.[37]

Under Plaintiff's allegations, it is thus plausible that KOC's alleged failure to detect and thereafter prevent Rivera's abusive behavior "proximately caused" Plaintiff's injuries. In other words, had KOC undertaken reasonable supervision of Rivera at Squires events, his alleged extensive abusive behavior, involving drugs, alcohol and pedophilia, would have come to light, resulting in Rivera's termination. In short, Plaintiff would not have been injured.[38]

Furthermore, I have examined the enunciated "interrelated factors" of Texas courts, *Greater*

---

[36] Defendant KOC argues that the allegations set forth in Plaintiff's Complaint regarding KOC's knowledge of sexual abuse by Columbian Squires leaders are merely conclusory, lacking specificity and supporting facts. Doc. #18, p. 20-21 (citing Doc. #1 (Complaint), ¶¶ 21-22). The Court, however, finds factual support that KOC knew or should have known of Rivera's blatant abusive behavior in paragraphs not cited by KOC, such as ¶ 13 (Rivera gave Plaintiff pornography to review with Rivera on at least 10 occasions), ¶ 17 ("[t]he horrible, nightmarish sexual abuse occurred at multiple locations in the United States on overnight trips, including many local and national events for the Columbian Squires"); *id.* (on those occasions, Rivera gave Plaintiff and other boys alcohol); *id.* (Rivera sexually abused Plaintiff "in the local Knights of Columbus[] hall where the Columbian Squires met, as well as Rivera's office and apartment"); and ¶ 18 (Rivera plied Plaintiff with clothing, money, dinners and the use of Rivera's motor vehicle).

[37] Plaintiff alleges that from 1978 to 1986, Rivera engaged in blatantly abusive behavior at official KOC settings, including lending Plaintiff to another Squires leader for sexual purposes and distributing drugs and alcohol at Squires meetings in the local KOC hall and at KOC events. Doc. #1, ¶ 17. Where inappropriate behavior was observable at KOC events, it is reasonable to impute constructive notice of abuse to KOC. Whether and to what extent KOC actually knew of Rivera's particular abusive conduct with the Squires during his years of leadership is a question of fact, which may be established during discovery.

[38] Reasonable supervision by KOC may have included unexpected attendance by outside KOC leaders at the Brownsville meetings; interviews with Squires under Rivera's supervision, either directly or anonymously; and/or general inspection of the KOC meeting premises and events (*e.g.*, for alcohol, narcotics, "pornographic" materials, and/or abusive conduct).

*Houston Transp. Co*., 801 S.W.2d at 525,  including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant.   After careful consideration,  I find that the risk, foreseeability, and likelihood of injury to Plaintiff by Rivera were all of notable magnitude.   That   Rivera's conduct –   plying Plaintiff with drugs and alcohol, subjecting him to pornography, sexually abusing him, and threatening him into silence with a handgun – had no "social utility" is self-evident.

Moreover, the magnitude of KOC's burden to guard against Plaintiff's injury was manageable in light of the location of much of the abuse, KOC's hall and events, and KOC's massive  size and numerous resources.   Unscheduled supervisory visits by KOC officials to meetings and events and/or interviews with Squires  would have sufficiently monitored Rivera's leadership.  Under such circumstances, KOC should not be allowed to profess ignorance of Rivera's activities in the Brownsville Squires to excuse KOC's failure to prevent abuse, especially where much of the alleged abuse occurred at KOC meetings and events.   Just as a multi-national corporation cannot disclaim any and all liability for conduct committed in its outlying offices and locations, neither should an organization of KOC's sophistication, size, and organized structure be allowed to avoid liability by claiming an inability to supervise those running its programs at satellite locations.

Finally, considering public policy factors – described by the Texas Supreme Court as "other relevant competing individual and social interests implicated by the facts of the case,"  *Peavy*,  89 S.W.3d at 33-34  –  where the Squires were minors, ranging in age, by Plaintiff's account, from 10 to 18 years old, KOC had a particular duty to ensure their welfare in the program.  KOC recruited

the boys to assist in "developing their leadership qualities" and "supporting the Roman Catholic Church." Doc. #1, ¶10. Furthermore, "[a] Columbian Squires unit [was required to] operate within the structure and regulations of the [KOC]." *Id.* Once minor boys became members of the Squires program in Brownsville, KOC should have supervised their activities and leadership to ensure the boys' welfare and determine whether the Squires were in fact operating according to KOC regulations.

Children, as vulnerable members of society, are owed greater care than their adult counterparts, who, in contrast, possess the maturity necessary to remove themselves from harmful situations.[39] Within the care of a charitable, religion-based organization, both the boys and their parents likely had a heightened expectation of safety.[40] As the Texas Court of Appeals described in *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d at 955, "the agreement to organize recreational activities for the minor [boys] and to properly supervise them during those activities arguably created a fiduciary relationship concerning that transaction" for club-associated activities on premises. Moreover, "organizations whose primary function is the care and education of children owe a higher duty to their patrons to exercise care in the selection of their employees than would other employers." *Id.* at 950-51 (citing *Doe v. Taylor Independent School Dist.*, 975 F.2d 137 (5th

---

[39] *See, e.g.*, *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d at 951 ("we recognize that Texas courts have long held that a higher standard of care is owed to children than to adults.") (citing *Galveston City R. Co. v. Hewitt*, 67 Tex. 473, 3 S.W. 705, 707 (1887)).

[40] Plaintiff and the other boys who attended Brownsville Squires meetings and took overnight trips to KOC national events, traveled under Rivera's supervision and counted on him for guidance and protection. Instead of protection, they were allegedly plied with alcohol and drugs, and/or sexually abused and passed around as victims from Rivera to at least one other KOC leader. As a matter of public policy, KOC should not be permitted to turn a blind eye to such horrific conduct by its youth program's leaders, which, the Complaint plausibly alleges, could reasonably have been detected at its meetings and events and hence prevented.

Cir.1992)).

In sum, balancing Texas' relevant factors regarding the multi-faceted issue of the legal duty of care, *Peavy*, 89 S.W.3d at 33-34, and pursuant to *Iqbal*, 556 U.S. at 678 , Plaintiff has pled sufficient factual matter, when  accepted as true, "to state a claim to relief that is plausible on its face."   At this preliminary pleading stage, construing the Complaint liberally, accepting all well-pleaded factual allegations as true and drawing all inferences in Plaintiff's favor,  Plaintiff has stated a plausible claim for negligence with respect to the element of foreseeability as to both duty and proximate cause.[41]   First, in light of Plaintiff's status as a minor, participating in a religious-based youth organization, KOC owed him a heightened duty of care with respect to his supervision and welfare at KOC meetings and events.  Second, given  Plaintiff's allegations describing Rivera's widespread, repeated and outrageous behavior as the Brownsville Squires leader, often at KOC events, KOC's failure to adequately supervise Rivera  may have proximately led to  Plaintiff's injuries from sexual assault. Accordingly, KOC's motion to dismiss for failure to adequately plead foreseeability in his negligence action will be denied.

### C.  Fraud & Misrepresentation Claims - Declaratory Relief

Finally, Defendant seeks dismissal of Plaintiff's Complaint on the grounds that the "Settlement Agreement and Full Release" bars his claims for both negligence and declaratory relief.

---

[41]   At the preliminary pleading stage, reading the Complaint in the light most favorable to Plaintiff and resolving all ambiguities in his favor,  the allegations suffice to state a plausible claim for negligent retention and supervision of Rivera.  Upon completion of  discovery, should KOC determine that the facts do not support Plaintiff's contentions of blatant sexual abuse within the Squires program, KOC may, if so advised, move for summary judgment, as did the defendants in the previously discussed Texas state cases of *Doe v. Boys Club of Greater Dallas, Inc.,* 907 S.W.2d 472 (Tex. 1995), and *Doe v. Catholic  Soc. of  Religious and Literary Educ.*, 2010 WL 345926, at *10 (S.D. Tex. Jan. 22, 2010).

Defendant argues that  (1) when Plaintiff signed the alleged release, he  was not justified in relying on the alleged misrepresentations by the KOC agent; and, (2) in any event, Plaintiff later ratified the release as a matter of law.   Doc. #18, p. 25-33.

### 1.     Declaratory Relief in General

In Count Two for "declaratory relief," Plaintiff  requests this Court to render declaratory judgment in his favor, thereby declaring the release at issue "void as procured by fraud." Doc. #1, ¶42.   "The Declaratory Judgment Act ["DJA"] by its express terms vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action." *Dow Jones & Co., Inc. v. Harrods Ltd.,*  346 F.3d 357, 359 (2d Cir. 2003) (per curiam). *See also* 28 U.S.C. § 2201 (a).[42]   The DJA has, in essence, placed "a remedial arrow in the district court's quiver," thereby creating an opportunity to grant "a new form of relief." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286-87, 288 (1995).  "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants," and the Supreme Court has "repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Id.* at 286–87 (internal quotations omitted)).

The district court thus retains discretion under the DJA to determine whether to exercise

---

[42]   28 U.S.C. § 2201(a) states in relevant part:

In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

*See also* Fed. R. Civ. P. 57 (stating that "[t]hese rules govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201").

jurisdiction over the action at issue, *Dow Jones & Co., Inc.*, 346 F.3d at 359, then considers "the litigation as a whole" and whether "practicality and wise judicial administration will predominate," *U.S. Underwriters Ins. Co. v. Kum Gang, Inc.*, 443 F. Supp.2d 348, 352-53 (E.D.N.Y. 2006) (citing, *inter alia*, *Wilton*, 515 U.S. at 288).

An action for declaratory judgment must meet the "case or controversy" requirement in that it "must be sufficiently real and immediate, allowing specific and conclusive relief . . . and be ripe for adjudication." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 237 F.Supp.2d 394, 406 (S.D.N.Y. 2002) (citing *Pub. Serv. Cmm'n v. Wycoff Co., Inc.,* 344 U.S. 237, 244 (1952)), *aff'd*, 346 F.3d 357 (2d Cir. 2003); *accord U.S. Underwriters Ins. Co.,* 443 F.Supp.2d at 352. In sum, declaratory relief "is available only for a 'concrete case admitting of an immediate and definite determination of the legal rights of the parties.'" *Pub. Serv. Comm'n*, 344 U.S. at 243 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)). The "simple test" articulated by the Second Circuit asks "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Dow Jones & Co.*, 346 F.3d at 359 (citing *Broadview Chem. Corp. v. Loctite Corp*., 417 F.2d 998, 1001 (2d Cir.1969)).[43]

In the case at bar, there exists, as Plaintiff contends, "an active controversy" between the parties with respect to the validity of the Release. Doc. #1, ¶ 42. If as KOC asserts, the Release is

---

[43]The Second Circuit has also acknowledged the test of "[o]ther circuits [who] have built upon this test, to ask also: (1) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy." *See Dow Jones & Co.*, 346 F.3d at 359-60 (citations omitted).

valid, Plaintiff has broadly released "all claims against  KOC, the Dioceses of Brownsville and Laredo, Texas, and all of their past, present, and future agents from any and all obligations,  causes of action, or claims in law or in equity."  Doc. #1, p. 11-12.   Specifically, if valid, the Release encompasses and bars  all of Plaintiff's claims in suit.  If, however, the Release was in fact procured by KOC agents through fraud, the Release is invalid and comprises no bar to the actions herein.  Because of this core controversy between the parties, the Court concludes, at the outset, that the matter of the Release is appropriately the subject of requested declaratory relief.

### 2.   Plaintiff's Claim for Declaratory Relief

In seeking declaratory relief, Plaintiff alleges that "[t]here is an actual controversy between the parties as to the validity of a 'Settlement Agreement and Full Release,'"which he has attached to his Complaint as Exhibit A.  Doc. #1, p. 11-17. Although he  admits that he executed the signature page appended to the release document, he contends that the KOC agents asked him to sign the document solely "to acknowledge that the Knights of Columbus would pay for his treatment."  *Id.*, ¶ 24.  Plaintiff asserts that his signature was obtained "as a result of the Knights' fraud and misrepresentation," which thereby "renders the purported agreement voidable."  *Id.*, ¶ 41.

In its pending motion to dismiss, KOC asserts that  Plaintiff has failed to state a valid claim for fraud and misrepresentation in that "(1) Plaintiff was not justified in relying on the alleged misrepresentation [when he signed the Release] and (2) Plaintiff has waived his right to assert fraud as a ground to avoid the Release because he ratified the transaction by accepting its benefits after gaining full knowledge of the alleged fraud."  Doc. #18, p. 23.   KOC reasons that because  "[t]he Release is valid," it "precludes Plaintiff's negligence claim."  *Id.*, p. 34.  As a result, KOC urges the Court to "dismiss Plaintiff's Complaint in its entirety."  *Id.*, p. 23.

The facts Plaintiff has alleged regarding his signature with respect to the Release are as follows.  In December 2009,  Plaintiff reported abuse by Rivera to KOC officials,  "disclosed  his long history of chemical addiction as a result of Rivera plying him with drugs and alcohol," and informed them "that he wanted to enter a treatment program."  Doc. #1, ¶ 23.  Plaintiff specifically asked the KOC Supreme Advocate for assistance in paying for treatment for his  addictions.  *Id*. According to Plaintiff, the Supreme Advocate agreed that KOC would pay for such treatment and never discussed or mentioned that the financial assistance would be given "to settle [Plaintiff's] claims" against the KOC.  *Id*.

Thereafter, on December 23, 2009, when a KOC agent and his wife met with Plaintiff, they allegedly told him that "they wanted to give him $200 to pay for his travel expenses to the rehabilitation facility."  *Id.*, ¶ 24.   However, before giving Plaintiff the money, the agent requested that he sign a document to acknowledge receipt of the $200.  *Id.*  Plaintiff complied by signing.  *Id*. The KOC agent then gave Plaintiff an additional, single piece of paper and asked Plaintiff "to sign it to acknowledge that [KOC] would pay for his [rehabilitation] treatment." *Id.*  Plaintiff alleges that he then signed that sheet and the agent's wife notarized the document.  *Id.*  The agent then allegedly "gave [Plaintiff] $200 in cash and quickly left."  *Id.*

"About a week later," Plaintiff "received a package in the mail with a copy of the document [he had] signed acknowledging receipt of the $200, along with an eight  page document he had never seen before entitled 'Settlement Agreement and Full Release.'" *Id.*   Plaintiff alleges that attached to the "strange" eight-page document was "the second signature page" that the KOC agent had instructed Plaintiff to sign.  *Id.*  As described by Plaintiff, the document facially "purports to be a release of [Plaintiff's] claims against the Knights of Columbus arising from his sexual abuse by

Rivera." *Id.*[44]

In sum, in Count Two, Plaintiff claims that he "was never presented with the release at the time he signed the document, nor was he otherwise informed that by his signature he would be releasing valuable legal rights." *Id.* He emphasizes that "[a]t no time" during the signing or thereafter "was there any discussion that the payment was to settle [his] legal claims against [KOC]." *Id.,* ¶ 23. Moreover, "[t]here was no discussion whatsoever of [Plaintiff's] substantial legal claim against the [KOC]." *Id.* Plaintiff thus alleges that "Defendant misrepresented to Plaintiff that the document he was being asked to sign pertained only to their agreement regarding treatment, which was false and made as a statement of fact." *Id.,* ¶ 37. That statement was allegedly "known by Defendant to be untrue" and was made "for the purpose and intent of deceiving him and inducing him to act by signing the document." *Id.,* ¶¶ 38-39. Plaintiff maintains that he "relied upon the Defendant's misrepresentation in signing the signature page" and therefore "the purported agreement [is] voidable." *Id.,* ¶¶ 40-41. He contends that "[w]hether the release is voidable as procured by fraud is an active controversy affecting his legal claims set forth in Count I" for negligence. *Id.,* ¶ 42. Consequently, Plaintiff requests that the Court render "a declaratory judgment

---

[44] *See* Doc. #1, p. 11-17 (releasing, in consideration for $11,000 payment to Crossroads Center of St. John's, Antigua, West Indies, for treatment of Plaintiff's "professed chemical dependency," "one round-trip airfare to and from Antigua," and "payment of reasonable additional sums not to exceed $100,000" for further treatment "within two years from January 24, 2010," all claims against "[KOC ,] the Dioceses of Brownsville and Laredo, Texas, and all of their past, present, and future agents" from any and all "obligations, actions, causes of action, . . . . [or] claims and demands whatsoever, in law or in equity"). *See also id.*, p. 11-12 (specifying that the release encompassed "any dealings between or among the Knights of Columbus Texas State Council and any of its subsidiaries, Knights of Columbus Squires and Juan J. ('Julian') Rivera"). Moreover, in a section entitled "Full Release of Liability," Plaintiff allegedly released, *inter alia,* "any and all known or unknown claims and resulting damages and losses," Plaintiff sustained as a result of any dealings with "Juan J. ('Julian') Rivera." *Id.*, p. 12.

that the release document" is "void as procured by fraud." *Id.*

Defendant KOC counters that Plaintiff cannot "avoid the clear consequences of the Release" because the facts "show as a matter of law" that Plaintiff "was not justified in relying on the alleged misrepresentation" and, in any event, Plaintiff "ratified the transaction by accepting its benefits after gaining full knowledge of the alleged fraud." Doc. #18, p. 23.

### 3.     Choice of Law

Before addressing the parties' arguments – that is, the legal sufficiency of Plaintiff's claim with respect to declaratory relief for fraud and/or misrepresentation –  the Court must determine the state  law applicable to that claim.  It is well-established that a district court sitting in diversity jurisdiction "must apply the choice of law rules of the forum state." *Brandewiede v. Emery Worldwide*, 815 F. Supp. 60, 63 (D. Conn. 1992) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).  In the forum state of Connecticut, the Court must determine whether there is more than one potential choice of law and whether "the laws of competing jurisdictions are actually in conflict." *In re Helicopter Crash Near Wendle Creek, British Columbia on Aug. 8, 2002*, 485 F. Supp. 2d 47, 55 (D. Conn. 2007) (quoting *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir.2004)).

With respect to the case in suit, the purported release contains a "Governing Law" provision that states that any dispute arising under it will be governed by Texas law.   In general, Connecticut law follows the Restatement (Second) of Conflict of Laws §187 (1971), holding that, absent limited exceptions,  "[t]he law of the state chosen by the parties to govern their contractual rights and duties

will be applied."[45] *Elgar v. Elgar*, 238 Conn. 839, 846 n.7 (1996) (quoting Restatement (Second) of Conflicts of Laws §187(2)(a)-(b)).

Furthermore, under Connecticut law, "[t]he fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily mean that a choice-of-law provision contained therein will be denied effect." *Elgar*, 238 Conn. at 848. Rather, "[t]his will only be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision." *Id.* (citing Restatement (Second) of Conflict of Laws § 187, Comment [b] and Illustrations 1 and 2).[46] "Otherwise, the choice-of-law provision will be given effect

---

[45]  Such exceptions to application of the stated choice of law include when either –

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

*Elgar v. Elgar*, 238 Conn. 839, 679 A.2d 937, 942 (1996) (quoting Restatement (Second) of Conflicts of Laws §187(2)(a)-(b)).

Under Restatement (Second) of Conflicts of Laws §188, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction." Restatement (Second) of Conflict of Laws §188 (1). In the absence of "an effective choice of law by the parties," courts look to such factors as: the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.* §188 (2).

[46]  Comment b, captioned "Impropriety or mistake," provides in relevant part:

A choice-of-law provision, like any other contractual provision, will not be given effect if the consent of one of the parties to its inclusion in the contract was obtained by improper means, such as by misrepresentation, duress, or undue influence, or by mistake. Whether such consent was in fact obtained by improper means or by mistake

51

provided that it meets the requirements of § 187."   In sum, Connecticut courts give "effect to an express choice of law by the parties to a contract provided that it was made in good faith." *Elgar*, 238 Conn. at 848; *see also  Int'l Union v. Gen. Elec. Co.*, 148 Conn. 693, 699  (1961).

Here Plaintiff makes no specific claim that the "choice of law provision" was obtained by improper means.  Rather he contends that the *entire contract* was obtained through fraud and deception.  Accordingly, he claims that prior to signing the contract, he never saw any page or provision apart from the signature page.  Although Plaintiff does not specify that KOC's alleged deception was directed specifically toward the choice of law provision in the Release, the alleged deception essentially encompasses *all provisions*, including choice of law.

Under Connecticut law, where a party alleges fraud in the execution of the contract, the court applies the most significant relationship test in evaluating the choice-of-law question. *See Economu v. Borg-Warner Corp.*, 652 F. Supp. 1242, 1247-49 (D. Conn. 1987), *aff'd*, 829 F.2d 311 (2d Cir. 1987); *Am. States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 461-62  (2007); Restatement (Second) of Conflict of Laws §187 cmt. b, §188 (1971).  Where a contract is entered by one party "without reading [the contract] in reliance upon the [other parties'] word," the "forum will not give effect to the provision calling for application of [a particular state's] law." Restatement (Second) of Conflicts of Laws § 187, comment b, illustration 2.  In the absence of an effective choice of law provision by the parties, the Court considers: (a) the place of contracting, (b) the place of negotiation of the

---

will be determined by the forum in accordance with its own legal principles. A factor which the forum may consider is whether the choice-of-law provision is contained in an "adhesion" contract, namely one that is drafted unilaterally by the dominant party and then presented on a "take-it-or-leave-it" basis to the weaker party who has no real opportunity to bargain about its terms.

1 Restatement (Second) of Conflict of Laws §187, Comment b (1971).

contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.  *Id.* §188; *see also id.* §145 (setting forth similar factors for state with most significant relationship to the occurrence of a tort).[47]

Examining the factors to be analyzed in the most significant relationship test, the facts surrounding the execution of the Release are not fully established in Plaintiff's Complaint.  For example, Plaintiff does not specify in which state he executed his signature.[48]  It is likely he was either in Kansas or Missouri, Plaintiff's present and past states of residence,  indicated by his Complaint, and the signature page of the Release, respectively.  Also, under one theory, the location of the subject matter of the contract may be Texas in that the Release pertained to alleged abuse of Plaintiff, which primarily occurred in Texas.  On the other hand, since Plaintiff had moved to Kansas and/or Missouri, his rehabilitation from substance abuse while domiciled in one of those states may have been the true subject matter of the Release.  Furthermore, Connecticut has an interest in applying its own law in that KOC is incorporated and headquartered in Connecticut and  likely negotiated and/or approved of the alleged agreement with Plaintiff from its Connecticut headquarters.

---

[47] Such factors include: "(a)  the place where the injury occurred,  (b)  the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Restatement (Second) of Conflict of Laws §145 (1971).

[48] In his Complaint, Plaintiff states that he is a "resident of the State of Kansas."  Doc. #1, ¶ 1.  On the signature page of the Release, however, Plaintiff indicates that he was "presently residing in Missouri" at the time of his signature.  *Id.*, Ex. A, p.7.  John A. Mahon, the Notary Public who witnessed Plaintiff's signature on December 23, 2009, indicated through his notary stamp that he was commissioned by the "State of Kansas."  Doc. #1, p. 17.

The Court need not, however, perform an in-depth choice of law analysis because the laws of all possible applicable states – Kansas, Missouri, Texas and Connecticut – are consistent on the issue of whether Plaintiff has properly pled fraud and misrepresentation with respect to the alleged release.[49]  In all relevant states, Plaintiff must plead (1) a false representation of fact made by KOC; (2) KOC's knowledge or belief that the representation was false, or made with reckless indifference to the truth; (3) intent by KOC to induce Plaintiff to act; (4) an action by Plaintiff taken in justifiable reliance on the representations made by the KOC agent(s); and (5) damage to Plaintiff as a result of such reliance.  *See, e.g., Alires v. McGehee*, 277 Kan. 398, 403 ( 2004) ("The elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment.") (citing *Gerhardt v. Harris*, 261 Kan. 1007, 1013 (1997)); *Hanson v. Acceptance Fin. Co.*, 270 S.W.2d 143, 149 (Mo. Ct. App. 1954) ("Comprehensively stated, the elements of actionable fraud consist of: (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon.") (quoting *Lowther v. Hays*, 225 S.W.2d 708, 713 (Mo. 1950)); *Marshall v. Kusch*, 84 S.W.3d 781, 785 n.4 (Tex.App.–Dallas 2002) ("A fraud cause of action requires: (1) a material misrepresentation, (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) which was intended to be acted upon, (4) which was relied upon, and (5) which caused injury.") (citing

---

[49] Where the law of two jurisdictions is the same on a particular issue, a "false conflict" is created in which no conflict of law analysis is necessary. *Dugan v. Mobile Medical Testing Service, Inc.,* 265 Conn. 791, 800 (2003).

*Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam)); *Leonard-Anthony Assoc., Llc v. Sherman Gardens, LLC,* No. CV085018651S, 2009 WL 2358296, at *3 (Conn. Super. Ct. June 29, 2009) ("The essential elements of an action in fraud . . . are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." (quoting *Miller v. Appleby*, 183 Conn. 51, 54-55, 438 (1981) and *Updike, Kelly & Spellacy v. Beckett*, 269 Conn. 613, 643 (2004)).

### 4.   Reliance on Alleged Misrepresentation

KOC asserts that, as a matter of law,  Plaintiff has failed to plead a viable claim for fraudulent misrepresentation because Plaintiff could not have justifiably relied on the purported misrepresentation that the one-page document he signed was simply an acknowledgment that KOC would pay for his treatment.  Doc. #18, p. 25.  KOC cites case precedent, quoting the Restatement (Second) of Torts, to argue that a recipient of a fraudulent representation cannot justifiably rely upon its truth "if he knows that it is false or if its falsity is obvious to him."  *Id.* (citing Restatement (Second) of Torts §541 (1977)).  *See, e.g.*, *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 536 (Kan. 1987) ("[I]f the recipient of a fraudulent representation has information which would serve as a danger signal to a person of ordinary intelligence and experience, he is not justified in relying upon that representation")(internal quotations and citation omitted); *Dyrssen v. Union Elec. Light & Power Co.*, 317 Mo. 221, 227 (Mo. 1927) ("The common law affords to every one reasonable protection against fraud in dealing; but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly or a careless indifference to the ordinary and accessible means of information.")(internal quotations and citation omitted); *Hanson v. Acceptance*

*Finance Co.,* 270 S.W.2d 143, 149 (Mo.App. 1954) ("The principle is well established that in order to secure relief on the ground of fraud, the complainant must have been justified, under the circumstances of the case, in relying upon the misrepresentation which is sought to be made the basis of the charge of fraud."); *Lewis v. Bank of America NA*, 343 F.3d 540, 546 (5ᵗʰ Cir. 2003) ("a person may not justifiably rely on a representation if there are 'red flags' indicating that such reliance is unwarranted")(internal quotations omitted), *cert. denied*, 540 U.S. 1213 (2004); *Werner v. Int'l Bank of Commerce*, 71 F.3d 879, 1995 WL 727545, at *2 (5th Cir. 1995) ("Texas law requires 'justifiable as well as actual' reliance on a defendant's alleged misrepresentation to support recovery for fraud."); *Chapman Lumber, Inc. v. Tager*, No. 10086006, 2003 WL 22080469, at *3 (Conn. Super. Ct. Aug. 22, 2003) ("[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.") (quoting 3 Restatement (Second) Torts § 541 (1977)).

Furthermore, KOC relies on United States Supreme Court precedent that although the recipient of a fraudulent misrepresentation is not barred from recovery based on negligent failure to discover its falsity, he must "use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field v. Mans*, 516 U.S. 59, 71 (1995) (*quoting* Restatement (Second) of Torts § 541 (1977)). For state precedent*, see*, *e.g., Slaymaker*, 241 Kan. at 536, *Hanson*, 270 S.W.2d at 149; *Lewis*, 343 F.3d at 546; *Gen. Motors Corp. v. Courtesy Pontiac, Inc.*, 538 S.W.2d 3, 6 (Tex. App. - Tyler 1976, no writ)).

"On the other hand, [this] rule . . . applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses." *Field*, 516 U.S. at 71.  In

sum, "[i]t is only where, *under the circumstances*, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id*. (*quoting* W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971))(emphasis added).

"[W]hat constitutes reasonable prudence and diligence with respect to such reliance, and what constitutes a reckless failure to exercise such prudence" differs from case to case. *Hanson v. Acceptance Finance Co.*, 270 S.W.2d 143, 149 (Mo. App. 1954). Courts "consider the various circumstances involved, such as the nature of the transaction, the form and materiality of the representation, the relation of the parties, the respective intelligence, experience, age, and mental and physical condition of the parties, and the respective knowledge and means of knowledge of the parties." *Id.*, citing, *inter alia*, 37 C.J.S., Fraud, § 30. Accordingly, each case must be decided upon its own facts.

In the case at hand, KOC argues that "[e]ven a cursory glance" at the single piece of paper signed by Plaintiff "would have alerted him [to the fact] that he was not signing a simple acknowledgment" of payment for treatment. Doc. #18, p. 27. KOC points to the five lines above Plaintiff's signature on that paper and states that "[t]his incomplete paragraph refers to 'this Agreement' and also references an earlier 'paragraph 4' that is not contained on the page."[50] *Id*. Defendant contends that such language, in addition to provisions about "a court of competent

---

[50] The five lines above Plaintiff's signature read as follows:

 . . . invalidated provision comprises an integral part of, or is otherwise clearly inseparable from, the intent and sense of this Agreement, as shall be determined by a court of competent jurisdiction (see paragraph 4 hereof), in which case the parties will attempt to agree upon a valid legally enforceable replacement provision.

Doc. #1, p. 17.

jurisdiction" and "a valid, legal and enforceable replacement provision," should have served to warn Plaintiff that he was being deceived. *Id.*, p. 29-30. Consequently, according to KOC, if Plaintiff had used his senses to make a cursory examination of the sheet at issue, he would have known he was not signing a simple acknowledgment. *Id.*, p. 28.

Plaintiff counters, arguing that he was justified in relying on the false statements of the KOC agent and his wife that he was being asked solely to sign an acknowledgment of his "receipt of a $200 payment and Defendant's promise to pay for his rehabilitation." Doc. #21, p. 22. Plaintiff was not presented with the text of the Release and "had no idea that there were other pages." *Id.*; *see also* Doc. #1, ¶23. Furthermore, even if he should have been aware that "there was more to the document than what he had seen, he had no reason to believe that the remainder of the document was intended to extinguish a substantial legal claim through the general release of all liability."[51] Doc. #21, p. 22. This was especially true where "he was being told the opposite by a representative of a non-profit organization affiliated with his church who appeared to demonstrate an interest in his recovery." *Id.*, p. 22-23.

Most importantly, Plaintiff asserts that "[t]he falsity of Defendant's representations was not known or obvious to him." *Id.*, p. 23. As Plaintiff states, "[i]t has long been the law in Connecticut that the victim of a misrepresentation has no duty to investigate the truthfulness of the deceit … no authority can be found to warrant the doctrine, that a man must use diligence to prevent being defrauded, otherwise he shall be entitled to no remedy." *Chapman Lumber v. Tager*, No.

---

[51] As Plaintiff contends, the "*reasonableness* of [his] reliance on Defendant's misrepresentation is a quintessential question of fact at this stage of the proceedings." Doc. #21, p. 24 (citing *Celanese Corp. v. Coastal Water Authority*, 475 F.Supp. 2d 623 (S.D. Tex. 2007) (under Texas law, "reliance is ordinarily a question for the fact-finder" and "while reliance, or lack thereof, may be established as a matter of law based on the evidence of record on summary judgment, it is not a proper matter for dismissal on the pleadings in this case")).

CV010086006S, 2003 WL 22080469, at *4 (Conn. Super. Ct. Aug. 22, 2003) (quoting *Sherwood v. Salmon*, 5 Day 439, 448 (1810) (Swift, J.)).  That is because a duty to investigate arises "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses."  3 Restatement (Second) Torts § 541 (1977), comment a.

Having reviewed the parties' arguments, the Court finds that it need not decide the merits of whether Plaintiff should have appreciated the falsity of the KOC agents' statements on December 23, 2009.  Rather, construing the Complaint liberally, accepting all well-pleaded factual allegations in the Complaint as true and drawing all inferences in Plaintiff's favor, the Court assesses his fraud/misrepresentation claim as to whether it contains sufficient factual matter to state a claim for fraud, and hence declaratory relief, that is plausible on its face.  I find that it does.

Granted, as KOC emphasized, the signature page Plaintiff executed contained a reference to "this Agreement, as shall be determined by a court of competent jurisdiction," and a designation at the bottom of the page that it is number "7."  Doc. #1, p. 17.   Nowhere on that page, however, is there any indication that such an agreement constituted a release of KOC's liability.  Even if a more worldly or discerning individual, upon being asked to sign, would have inquired regarding the text on possible additional pages, it remains a question of fact as to whether Plaintiff should have recognized the falsity of the KOC agents' representations and performed an investigation before signing.  With only four and a half lines of incomplete text referring to an "Agreement," Plaintiff could plausibly have believed  that the entire document was drafted to evidence Plaintiff's acknowledgment that KOC agreed to pay for his substance abuse treatment.   Moreover, Plaintiff may have, as he claims, trusted the representations made to him on the basis of the nature of the KOC organization (a Catholic fraternal benefit organization) and the concern the KOC agent and his

wife expressed regarding his welfare.

In light of the facts pled by Plaintiff, the Court finds that Plaintiff has stated a valid legal claim upon which relief may be granted.  Particularly with respect to justifiable reliance, Plaintiff claims that  he was presented with a sole signature page and told that "the document he was being asked to sign pertained only to their agreement regarding treatment, which was false and made as a matter of fact." Doc. #1, ¶ 24.  Nothing on that signature page mentioned a release, evidenced a direct falsehood and/or directly contradicted the Defendant's representations at the signing.[52]  *Id.*, p. 17.   He thus relied on the words of the KOC agents to sign the page presented.  *Id.*, ¶¶ 40-41. In the absence of a patent red flag of fraud (*i.e.*, a "danger signal" to a person of ordinary intelligence and experience) on the signature page, the Court will not at this time hold that Plaintiff could not, as a matter of law,  have justifiably relied on the KOC agents' representations.

### 5.     Alleged Ratification of Release

Lastly, KOC argues that even if Plaintiff had justifiably relied on the alleged misrepresentations at the December 23, 2009 execution of the signature page, he "waived his right to assert fraud as a ground to avoid the Release because he ratified the transaction by accepting its benefits after gaining full knowledge of the alleged fraud." Doc. #18, p. 30.  As Defendant asserts, at common law, the question of ratification is a matter of law if the supporting evidence is clear. Doc. #18, p. 23.  *See, e.g.*, *Old Rep. Ins. Co. v. Fuller*, 919 S.W.2d 726, 728 (Tex. App. - Texarkana

---

[52]   Of particular note, the word "release" does not appear on the one-page document, such that a cursory examination, a re-read ,or a more careful read of that page would have revealed that a release of claims was intended.    Consequently, Plaintiff has not blindly relied upon a misrepresentation  which would have been "patent to him if he had utilized his opportunity to make a cursory examination or investigation."  *Field v. Mans*, 516 U.S. 59, 71 (1995).

1996, writ denied) (""The question of ratification of a contract may be determined as a matter of law if the pertinent evidence is uncontroverted or uncontrovertible."). *See also Young v. Data Switch Corp.*, 231 Conn. 95, 103 (1994) (trial court did not abuse its discretion in concluding former employee ratified severance agreement as matter of law by accepting benefits and by allowing 17 months to expire before raising basis for disaffirming contract).

Under the laws of all four potentially relevant state jurisdictions (Kansas, Missouri, Texas, and Connecticut), a party waives his right to avoid a contract for misrepresentation if he manifests to the other party his intent to affirm the contract, acts in a manner inconsistent with disaffirmance, or fails within a reasonable time to disclose his intention to avoid the contract. *See* e.g., *Moore v. Farm & Ranch Life Ins. Co*., 505 P.2d 666, 672-73 (Kan. 1973); *Anselmo v. Mfrs. Life Ins. Co*., 771 F.2d 417, 420 (8th Cir. 1985); *Cordero v. Tenet Healthcare Corp*., 226 S.W.3d 747, 750 (Tex. App.—Dallas 2007, pet. denied); *E. Devoe Tompkins, Inc. v. Bridgeport*, 123 A. 135, 137-38 (Conn. 1923)("one who was led into a contract by fraud was privileged to repudiate the contract if, and only if, he proceeded to do so promptly upon his discovery of it, or within a reasonable time thereafter"). Specifically, by retaining the benefits of a contract obtained by fraud, "the defrauded party waives any right to assert fraud as a ground to avoid the agreement." *Id.* (citing, *inter alia*, *Moore v. Farm & Ranch Life Ins. Co., Inc*., 211 Kan. 10, 18 (Kan. 1973) ("a party will not be permitted to accept the benefit of a contract, with full knowledge of all the facts, and then deny his own responsibility thereunder").

With respect to a Rule 12(b)(6) motion to dismiss, the Court treats all well-pled facts in the Complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). KOC argues that in the present case, the facts pled by Plaintiff show "a ratification of the alleged fraud as a matter of law." Doc.

#18, p. 32.  In particular, Plaintiff alleged that he was fraudulently induced to sign the signature page on December 23, 2009 and did not see the other pages comprising the "Settlement Agreement and Full Release" until "[a]bout a week later," when he received it in the mail.  Doc. #1, ¶ 24.  According to KOC, Plaintiff did not, however, "make any mention of an alleged fraud or attempt to challenge the validity of the Release until the filing of this lawsuit" almost a "full year later."  Doc. #18, p. 32. Defendant thus contends that "[a]ccording to Plaintiff's own allegations, he gained full knowledge of the alleged fraud only a week after it allegedly occurred, but instead of taking action to rescind the Release, he remained silent and accepted the full benefits of the Release."  *Id.*, p. 33.  Defendant thus urges that, based on the year that expired between Plaintiff's discovery of the Release and the filing of this lawsuit, Plaintiff should not be allowed to avoid the obligations under the Release.  *Id.*

Plaintiff disagrees with this characterization of his post-signing behavior as "ratification" of the fraudulently created release.  He accepts that he "discovered the fraud in approximately late-December 2009" and "filed this lawsuit on December 14, 2010."  Doc. #21, p. 24 (citing Complaint, Doc. #1, ¶24).  Nonetheless, he claims that he "never vacillated from his position that he was duped nor has he remained silent and accepted the full benefits of the Release."  *Id.* (internal quotations omitted).  Plaintiff contends that he never bargained with KOC to enter into the Release and therefore did not accept the benefit of a bargain and repudiate it.[53]  Doc. #21, p. 24-25.  Rather, he

---

[53]  Indeed,  if  Plaintiff had  negotiated with KOC, it appears unlikely from the face of the Complaint that he would have considered $200 and a brief treatment program for substance abuse as adequate compensation to release all of his claims arising from sexual abuse by KOC Squires leader Rivera.  According to Plaintiff, such abuse derailed his teenage and adult years, and chemical addiction was just one aspect of the severe damage he incurred.  *See* Complaint, Doc. #1, ¶ 22 (As a direct and proximate result" of KOC's "acts and omissions," Plaintiff "suffered severe and permanent physical and psychological injuries, including, but not limited to, chemical addictions, nightmares, depression, anxiety, suicidal tendencies, lack of trust, anger, shame, embarrassment, guilt, and low self-esteem.").

did not "understand [that] he had given anything to Defendant in exchange for the $200 payment and offer to pay for counseling." *Id*., p. 25.   Lastly, Plaintiff justifies what he deems "[t]he brief period between the date he discovered the fraud and the date he filed his lawsuit" as reasonable under the circumstances because he "had to obtain an attorney experienced in the areas of childhood sexual abuse and fraud to investigate the facts of his case." *Id.*

The Court examines the dates, as set forth in the Complaint, and Plaintiff's alleged actions to determine whether he may have ratified the release at issue as a matter of law after signing the signature page. The Complaint specifies that Plaintiff executed the signature page on December 23, 2009. Doc. #1, ¶ 24. "About a week later, [Plaintiff] received a package in the mail with a copy of the document [he] signed acknowledging receipt of the $200, along with an eight page document he had never seen before entitled 'Settlement Agreement and Full Release.'" *Id.*   On the face of the Release, attached to the Complaint as Exhibit A, the Releasor, "in consideration of [e]leven-thousand dollars ($11,000), paid on behalf of the Releasor by the Knights of Columbus to Crossroads Centre, Antigua [in] St. John's, Antigua, West Indies, for the treatment of the Releasor's professed chemical dependency, commencing on or around December 26, 2009 and concluding with the Releasor's discharge on or around January 24, 2010," as well as "one round-trip airfare to and from Antigua," and "reasonable additional sums not to exceed $100,000 to be made, if at all, within two years from January 24, 2012," with the distribution of those sums "to be determined at the sole discretion of the Knights of Columbus . . . for follow-up treatment [of Plaintiff] for chemical dependency."

If the Release accurately represents the dates of Plaintiff's initial treatment for chemical dependency as December 26, 2009, he likely did not receive the Release documents in hand  prior to his departure for Antigua for treatment.   Plaintiff alleged that he did not receive the full release

document until at least "[a]bout a week" after signing on December 23, 2009." Doc. #1, ¶ 24. Consequently, according to Plaintiff's Complaint, he would not have received the Release in hand until approximately December 30, 2009, by which time he would have already begun his chemical dependency treatment.  Once in this program in Antigua, it is unknown whether Plaintiff was allowed to communicate with those in the outside world, such as KOC, and/or to  seek legal assistance.  Because Plaintiff alleges he was unaware of the purported Release at the time of signing – did not connect the $200 in pocket expenses and/or the tuition for his treatment with release of all of his potential claims prior to his entry into treatment – he could not repudiate such "benefits" prior to treatment.[54]

The facts as pled leave open a number of factual issues – *e.g.,* what were the actual and exact dates and programs of Plaintiff's chemical dependency treatment in Antigua or elsewhere; on what exact date and in what location did Plaintiff receive the Release in the mail; did Plaintiff contact KOC to discuss the contents or possible significance of the Release and, if so, when; what disbursements were made from KOC to Plaintiff and/or to any rehabilitation program provider, and when did such payments occur;  did Plaintiff refuse or attempt to return funds received from KOC after learning of the Release.  Such evidence could clearly bear on the outcome of the ratification issue, but does not appear on the face of the Complaint.

Finally, KOC relies on the filing date of this action – almost one year after Plaintiff allegedly learned of the alleged fraud and/or misrepresentation by KOC – as the sole basis for arguing that

---

[54]  Plaintiff  contends that  he never knowingly released his claim against KOC and could not, therefore,  repudiate a contract he did not form.  Doc. #21, p. 24-25.

Plaintiff ratified the Release.[55]  Under Connecticut law, a three-year statute of limitations applies to actions based upon misrepresentation and fraud.  *See* Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of.").  *See also Coachman-Francis v. Connecticut Attorneys Title Ins. Co.*, No. HHDCV106011498S, 2012 WL 234147, at *3 (Conn. Super. Ct. Jan. 3, 2012) ("[T]here is no dispute that the statute of limitations applicable to actions for fraudulent misrepresentation . . . is the three-year period found in § 52–577.") (citing *Wedig v. Brinster*, 1 Conn.App. 123, 135–37 (1983), *cert. denied*, 192 Conn. 803  (1984)).  Because Plaintiff brought his claim within one year of the alleged fraudulent misrepresentations by KOC, it is not time-barred by the statute of limitations.

Absent specific evidence supporting ratification and in the context of a Rule 12(b)(6) motion, as opposed to summary judgment, the Court does not deem the Complaint's filing date as sufficient evidence, standing alone, of ratification. At the pleading stage, in the absence of incontrovertible facts on the face of Plaintiff's Complaint that ratification occurred,  and given that Plaintiff filed his fraud/misrepresentation claim within the requisite limitations period, the Court will not dismiss the claim for declaratory relief as a matter of law.  Whether there was fraud or misrepresentation with respect to the Release, and  Plaintiff's actions thereafter, must be investigated during discovery and ultimately found by the trier of fact.  KOC's motion to dismiss Count Two will be denied.

---

[55] Although, as Defendant  claims, the  filing date of Plaintiff's action may be viewed as one date upon which he  repudiated the purported Release, it is also possible that Plaintiff previously disclosed his opinion that the Release was invalid through other means.  The existence of any prior statements by Plaintiff as to the Release's invalidity remains an unknown question of fact.

**D.**    **Defendant's Motion for Bifurcation**

**1.**    **Legal Standard to Bifurcate**

Under Federal Rule of Civil Procedure 42(b), a district court has broad discretion to try issues and claims separately in order to "further convenience, avoid prejudice, or promote efficiency."[56] *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999).  In particular, "bifurcation may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue . . . or where one party will be prejudiced by evidence presented against another party[.]" *Id.* (citations omitted). *See also Vichare v. AMBAC, Inc.,* 106 F.3d 457, 466 (2d Cir.1996) (holding bifurcation to be "appropriate where the evidence offered on two different issues will be wholly distinct . . . or where litigation of one issue may obviate the need to try another issue").  9A Wright & Miller, *Federal Practice & Procedure* § 2388 (3d ed. 2009) ("[i]f a single issue could be dispositive of the case . . . and resolution of it might make it unnecessary to try the other issues in the litigation, separate trial of that issue may be desirable to save the time of the court and reduce the expenses of the parties"). The interests of judicial economy are particularly served when trial of the determinative issues is likely to be much shorter than the trial of the remaining issues. *See Reines Distributors, Inc. v. Admiral Corp.*, 257 F. Supp. 619, 622 (S.D.N.Y. 1965).

Because "the general practice is to try all the issues in a case at one time," *Miller v. Am. Bonding Co.*, 257 U.S. 304, 307 (1921), bifurcation is the exception and "not the rule," *Svege v. Mercedes-Benz Credit Corp.,* 329 F. Supp.2d 283, 284  (D. Conn. 2004).   *See also U.S. v. 43.47*

---

[56]Fed. R. Civ. P. 42(b), captioned, "Separate Trials," provides in relevant part:

For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.

*Acres of Land*, 45 F. Supp. 2d 187, 190  (D. Conn. 1999) ("Bifurcation . . .  is a procedural device

to be employed only in exceptional circumstances.") (citing *Marisol A. v. Giuliani*, 929 F. Supp. 662,

693 (S.D.N.Y. 1996)); *Rosa v. Town of East Hartford*, No. 3:00CV1367 (AHN), 2005 WL 752206,

at *4 (D. Conn. Mar. 31, 2005) ("Even though bifurcation is not unusual, it nonetheless remains the

exception rather than the rule."); *Dallas v. Goldberg*, 143 F. Supp.2d 312, 315 (S.D.N.Y. 2001)

(collecting cases) (same).  "[W]here there is a significant overlap in the evidence pertaining to the

claims to be separated, bifurcation will not serve judicial economy."  *ABB Indus. Systems, Inc. v.

Prime Technology, Inc.*, 32 F. Supp.2d 38, 43 (D. Conn. 1998) (citing *Katsaros v. Cody*, 744 F.2d

270, 278 (2d Cir.1984)).[57]

 "In establishing that bifurcation is warranted, the burden falls squarely on the party seeking

bifurcation." *Guidi v. Inter-Continental Hotels Corp.*, No. 95 Civ. 9006 (LAP), 2003 WL 1846864,

at *1 (S.D.N.Y. April 8, 2003) (citing  *Dallas*, 143 F.Supp.2d at 315).   "[T]he movant must justify

bifurcation on the basis of the substantial benefits that it can be expected to produce."  *Svege,* 329

F. Supp.2d at 284.

Bifurcation is within the district court's discretion and decided on a case-by-case basis.

*Idzojtic v. Pennsylvania R.R.* Co., 456 F.2d 1228, 1230 (3d Cir. 1972).[58]   Moreover, Rule 42(b)

"simply does not give rise to a bright-line test." *Guidi*, 2003 WL 1846864, at *1 (quoting *Monaghan

v. SZS 33 Assocs., L.P.*, 827 F. Supp. 233, 245 (S.D.N.Y. 1993)). It is thus incumbent on the Court,

---

[57]   *See also*  Advisory Committee's Notes to Rule 42(b), admonishing that "separation of issues for trial is not to be routinely ordered." Advisory Comm. Notes, 1996 Amend., Fed. R. Civ. P. 42(b).

[58]   *See also*  *Morse/Diesel,  Inc. v. Fidelity Deposit Co. of Maryland*, 763 F. Supp. 28, 35 (S.D.N.Y. 1991) ("[a] motion to sever and stay under Fed. R. Civ. P. 42(b) is addressed to the discretion of the court").

"[o]n a case-by-case basis . . . [to] examine, among other factors, whether bifurcation is needed to avoid or minimize prejudice, whether it will produce economies in the trial of the matter, and whether bifurcation will lessen or eliminate the likelihood of juror confusion." *Svege,* 329 F. Supp. 2d at 284. *See also U.S. v. 43.47 Acres of Land*, 45 F. Supp.2d at 190-91 ("Bifurcation is only appropriate where (1) separate trials would promote judicial economy and convenience; or (2) a single trial would prejudice the interests of a party.") (citation omitted).

Exercising its discretion, the Court examines such factors as:   (1) whether the pertinent issues are significantly different from one another; (2) whether the issues are to be tried before a jury or to the court; (3) whether the posture of discovery on the issues favors a single trial or bifurcation; (4) whether the evidentiary issues overlap; and (5) whether the party opposing bifurcation will be prejudiced if it is granted.   *See, e.g.*, *Strychasz v. Maron Const. Co., Inc.*, No. Civ. 3:01CV2063(PCD), 2002 WL 32500874, at *4 (D. Conn. July 16, 2002); *Guidi,* 2003 WL 1846864, at *1.

### 2.   **Defendant's Request to Bifurcate**

In the case in suit, Defendant seeks bifurcation for the following "three reasons: (1) "final determination on the validity of the Release is potentially dispositive;" (2) "a preliminary determination as to the validity of the Release has the potential to save the Court and the parties valuable resources and time," especially since "[t]he facts to be determined arise from recent events and involve a few documents and a handful of witnesses;" and (3) "were a single jury to be charged with determining the validity of the Release and liability for negligence and damages, the Knights would suffer unnecessary and undue prejudice."[59]   Doc. #23, p. 1-2.

---

[59]   The Court notes that Plaintiff has demanded a jury trial with respect to this action.   The right to a jury trial in a declaratory judgment action depends on whether a claim is legal or equitable.

Examining each of the Defendant's bases for bifurcation in turn, the Court finds that Defendant has met the burden of establishing that bifurcation is merited.   First, preliminary adjudication of the issue regarding the validity of the Release may entirely eliminate the need to litigate Plaintiff's negligence claim.   As Defendant asserts, "[t]he course of this case . . . hinges on the validity of Plaintiff's Release of his claims."   Doc. #23, p. 1.   Given the sweeping language of the Release's provisions, if that agreement is found to be valid, Plaintiff's remaining negligence action may be barred.   Disposition of the validity of the Release will thus potentially prevent unnecessary expenditure of resources by the parties and promote judicial economy.

Examining judicial economy, the Court notes that bifurcation will result in limited,

---

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 515 (1959) ("When declaratory relief is sought, the right to trial by jury depends upon the basic context in which the issues are presented"  – whether they are "traditionally cognizable in equity" or "at common law.").  *See also* 10 Fed. Proc., L. Ed. § 23:57 (captioned, "Obtaining Declaratory Judgment Relief");  26 C.J.S. Declaratory Judgments § 164 ("Right to jury trial") (Westlaw 2012) (Since declaratory relief is neither legal nor equitable *per se*, but is *sui generis*, the right to a trial by jury depends on whether the claim is legal or equitable in nature.).   "Thus a right to a jury normally exists where the relief sought is legal or remedial in nature, whereas no such right ordinarily exists where the plaintiff invokes the coercive powers of the court in a manner analogous to traditional equitable remedies."  *Id.  See, e.g., Holland v. Metropolitan Property and Cas. Ins. Co.*, 153 Idaho 94, 279 P.3d 80, 86 (2012)  ("There is no right to a jury trial for such a declaratory judgment action" seeking to enforce a settlement agreement.).

Moreover, even when a claim is considered equitable in nature, a jury may be used in an advisory capacity to find the facts, after which the Court enters the declaratory judgment. *See, e.g., (American) Lumbermens Mut. Casualty Co. of Illinois v. Timms & Howard*, 108 F.2d 497, 500 (2d Cir. 1939) (In equitable declaratory judgment action concerning obligation of automobile liability insurer under policy, court found " no reason why the parties, with the approval of the judge, should not agree that an advisory verdict be taken as in equity and with the same weight as such a verdict had in equity.").

Here the declaratory judgment sought involves a determination as to whether common law fraud and/or misrepresentation has been employed to procure a  release agreement.  Such actions have traditionally been cognizable at common law, making them subject to determination by a jury, as Plaintiff has demanded.

evidentiary overlap.  The majority of facts pertaining to the validity of the Release, especially the testimony regarding negotiations and signing of the Release,  are separate and distinct from the facts relevant to Plaintiff's negligence  claim stemming from his  alleged sexual abuse by Rivera.  It is thus unlikely that bifurcation of discovery and trial would result in multiple witnesses being recalled or evidence being presented repeatedly.

Furthermore, considering undue prejudice to Defendant,  segregation of the issue of validity of the Release will prevent one  jury from considering that issue simultaneously with the negligence claim arising from the alleged horrific sexual abuse of Plaintiff.  Because the evidence regarding negligence is likely emotionally disturbing and graphic in nature, it merits concern that such evidence might unduly influence or  predispose the jury with respect to KOC's  alleged fraud and misrepresentation  in procuring the Release.  Similarly and alternatively, were the jury to conclude that a KOC agent acted unethically in procuring the Release, that same jury might be influenced or predisposed to finding KOC liable in the alleged negligence action.  As Defendant argues, "were a single jury to be charged with determining the validity of the Release and liability for negligence and damages," KOC might "suffer unnecessary and undue prejudice."  Doc. #23, p. 2.  Accordingly, segregation of  the issue of validity of the Release from the potentially emotional and graphic evidence of sexual abuse will minimize the likelihood that the jury will be prejudiced or influenced in considering the separate issues to be adjudicated.

### 3.      Plaintiff's Objection to Bifurcation

Plaintiff objects to Defendant's Motion to Bifurcate "on two grounds."  Doc. #30, p. 1.  He argues that "[f]irst, the evidence of sexual abuse that Defendant contends would prejudice the jury in deciding the release issue, is in fact relevant to both Counts in the Complaint, and thus bifurcation

would not materially reduce any potential prejudice." *Id.* "Second, separating issues with overlapping evidence into two completely separate trials would inconvenience the Court and the parties, and would not be in the best interest of judicial economy or justice." *Id.*, p. 1-2.

With respect to prospective prejudice to KOC and overlapping evidence, Plaintiff states that "the testimony underlying sexual abuse is relevant to both the Negligence Count and the Release Count" such that there will be "substantial overlap in the proof of both claims." *Id.*, p. 2. Thus, "[i]n proving that Defendant deceptively induced Plaintiff into signing a purported release document, Plaintiff intends to present testimony and evidence relating to the *motive* and *intent* of Defendant to deceive Plaintiff" – that is, "to fraudulently evade a claim for substantial damages arising from child sexual abuse, and instead only pay the nominal amount of $200 and the costs of psychological treatment."[60] *Id.*, p. 2-3 (emphasis in original). Plaintiff contends that to establish KOC's exposure to liability will require "evidence of the 'brutal' sexual abuse and the Defendant's acts and omissions involving Julian Rivera." *Id.* Specifically, Plaintiff asserts that "evidence of the damages caused by sexual abuse" will be "relevant" with respect to the Release issue because such evidence will show that KOC sought "a great windfall as a result of procuring a release from Plaintiff by fraud." *Id.*, p. 3.

Granted, the elements of fraud at common law in either Connecticut or Texas, two states with significant relationships to the action, include an intent by the defendant to induce the plaintiff to act and damage to the plaintiff as a result of his reliance on defendant's knowingly or recklessly

---

[60] KOC counters Plaintiff's characterization of monies it paid Plaintiff with respect to the Release as "nominal," maintaining that KOC intends to demonstrate through documentary evidence that the actual amounts it paid on the Release between December 2009 and December 2010 for Plaintiff's treatment and other benefits were in fact substantial– "in excess of $120,000." Doc. #31, p. 2 n.2. The actual amounts and dates of payment remain unproven and may, if Defendant is so advised, be revisited upon a motion for summary judgment.

false statements.  However, the Court is unpersuaded that Plaintiff will have to present all detailed evidence of his sexual abuse in order to prove KOC's intent. Rather, with respect to KOC's motive, Plaintiff need only present evidence of what KOC knew regarding the alleged sexual abuse as of December 23, 2009, the date he executed the signature page now appended to the Release.  In that regard, Plaintiff may present evidence, for example, of facts he provided to the KOC Supreme Advocate and/or KOC agent either before or during the signing.  In sum, evidence probative of intent will include what KOC knew as of December 23, 2009, and not every instance of sexual abuse that may have occurred.

With respect to damages, Plaintiff may provide evidence of damages he sustained as a result of the alleged sexual abuse, which may include, *inter alia*, his out-of-pocket costs of treatment for narcotics addiction and/or resulting emotional damage.  Plaintiff may thus present a reasonably approximate calculation of the amount he seeks to recover by pursuing his negligence action.  Once again, all details of Plaintiff's sexual abuse need not be presented.

In sum, although there is necessarily a limited amount of evidentiary overlap with respect to Plaintiff's negligence and declaratory relief/release claims, such overlap does not negate the fact that adjudication on the validity of the Release may dispose of this action, thereby preventing further proceedings and testimony.

Lastly, holding an initial trial on the validity of the Release will not prejudice Plaintiff or delay resolution of his claims, but rather streamline any subsequent trial on his negligence action. The facts surrounding the signing of the Release, including the documents and testimony of the handful of witnesses who were then present, may be presented at the first, and potentially only, trial. Moreover, according to KOC, "[d]iscovery can be completed in weeks, not months or years." Doc.

#23, p. 2.

In sum, the Court finds it in the best interest of both parties to grant Defendant's Motion to Bifurcate pursuant to Federal Rule of Civil Procedure 42(b).  Doc. #22.   Bifurcation will further convenience, avoid prejudice, and likely promote efficiency.  The validity of the Release will be addressed first, both in discovery and subsequently, if necessary, at trial.  Should the Release be held invalid – that is, procured fraudulently via misrepresentations by KOC's agent – the remaining discovery and trial on the negligence claim will follow.

The Court thus ORDERS that, on or before **March 22, 2013**,  the parties shall confer and file with the  Court their recommendations for case deadlines with respect solely to Count Two:   the issue of whether the Release was obtained through fraud and misrepresentation.  Upon receipt and review of the proposed deadlines, the Court will set revised case deadlines to reflect bifurcation of Counts One and Two.  Upon adjudication of Count Two, regarding validity of the Release, the Court will, if necessary and after recommendation by the parties, set similar deadlines with respect to Plaintiff's negligence action.

## VI.   <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant's Motion to Dismiss for Failure to State a Claim (Doc. #17) is DENIED in its entirety.  Defendant's Motion to Bifurcate Counts One and Two of Plaintiff's Complaint for trial (Doc. #22) is GRANTED.  Bifurcation of these claims will further convenience of the parties and witnesses, avoid prejudice to Defendant, and promote judicial efficiency  in  potentially  disposing  of  the  entire  action  or  moving  expeditiously  forward. Consequently, discovery and trial will be held first on Plaintiff's second claim for declaratory relief with respect to whether the release document attached to Plaintiff's Complaint as Exhibit A, entitled

"Settlement Agreement and Full Release," is void as "procured by fraud."  Doc. #1, ¶ 42.

It is the Court's understanding from the papers that Plaintiff was a citizen of the state of Kansas at the commencement of this action, and thus his citizenship is diverse from that of Defendant, as a Connecticut corporate citizen. Such diversity of citizenship confers subject matter jurisdiction on this Court.  12 U.S.C. § 1332(a)(1).  If, however, Plaintiff was  a citizen of (*i.e.*, domiciled in) a state other than Kansas at the action's commencement, he must so inform the Court by affidavit on or before **March 22, 2013.**  Absent such a filing by Plaintiff with  respect to his citizenship, the Court will  accept that the Complaint's jurisdictional allegation that, for diversity purposes, Plaintiff and KOC are citizens of Kansas and Connecticut, respectively.

Finally, both parties are directed to confer and submit their joint recommendations for updated case deadlines for discovery and trial of Count Two, regarding the validity of the Release, on or before **March 22, 2013**.

The parties may wish to consider waiving a jury with respect to the bifurcated trial of Count Two, and consenting to a bench trial on that issue.

It is So Ordered.

Dated: New Haven, Connecticut
       March 12,  2013

                                    */s/Charles S. Haight, Jr.*
                                    CHARLES S. HAIGHT, JR.
                                    SENIOR  UNITED  STATES  DISTRICT  JUDGE